UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK

---------------------------------------------------------x

In re                                                                Chapter 11

     HYPNOTIC TAXI LLC, et al.,

                                  Case No.  15-43300 (CEC)

                     Debtors.

---------------------------------------------------------x

     CITIBANK, N.A.,

                      Plaintiff,       Adv. Pro. No. 15-01185 (CEC)

         - against -

     BOMBSHELL TAXI LLC, et al.,

                   Defendants.

---------------------------------------------------------x


<u>DECISION AFTER TRIAL</u>


Appearances:

Jantra Van Roy, Esq.,                   Brett A Berman, Esq.,
Robert Guttmann,Esq. &             Matthew S. Adams, Esq. &
Nathan Schwed, Esq.,                 Hal L Baume, Esq.
Zeichner Elleman & Krause LLP      Fox Rothschild LLP
1211 Avenue of the Americas, 40th Floor   2000 Market Street, 20th Floor
New York, NY 10036                 Philadelphia, PA 19103

Attorneys for Plaintiff               Attorneys for Defendants

CARLA E. CRAIG

Chief United States Bankruptcy Judge

In this proceeding, which was removed by the debtors to this Court from Supreme Court, New York County, Citibank, N.A. ("Citibank" or Plaintiff"), the principal creditor of the debtors, seeks to collect amounts owed to it from Evgeny Freidman ("Freidman" or "Defendant"), guarantor of the debtors' obligations. This motion presents two questions: (1) whether Citibank is entitled to an order of attachment against Freidman's property, and (2) whether an order of attachment to secure a judgment against Freidman can attach property which Freidman transferred to four trusts in June, 2015.

The answer to both of these questions depends upon the purpose and intent of Freidman's transfer, in June, 2015, of his interests in various limited liability companies ("LLCs") and corporations owning real estate estimated to be worth more than $60 million, to four offshore trusts for the benefit of himself and members of his family, without consideration. Freidman maintains that these transfers were for estate planning purposes, while Citibank contends that the circumstances show that the transfers were made to defraud creditors or to frustrate the enforcement of a judgment that might be entered in Citibank's favor. The timing of the transfers, the chronology of events surrounding them, the testimony heard at the trial held on November 30, 2015, and the documentary evidence in the record, demonstrate that these transfers were made with intent to defraud Freidman's creditors or to frustrate a judgment that might be entered in Citibank's favor. For this reason, and because the requirements of CPLR 6212(a) are met, the first question is answered in the affirmative, and the stay, entered on November 19, 2015 (ECF 34), of the order of attachment entered on November 17, 2015 (ECF 28), is lifted[1].  This

---

[1] Citations to "CPLR" are to the New York Civil Practice Law and Rules (McKinney). Citations to "ECF" are to documents filed on the docket of this proceeding, identified by docket number.

evidence also establishes that it is proper for the order of attachment to reach the assets transferred to the Trusts, for reasons explained in this decision.

## Jurisdiction

This Court has jurisdiction of this proceeding pursuant to 28 U.S.C. § 1334(b), and the Eastern District of New York standing order of reference dated August 28, 1986, as amended by order dated December 5, 2012.

This non-core proceeding is related to these bankruptcy cases. *See* In re Cuyahoga Equip. Corp., 980 F.2d 110, 114 (2d Cir. 1992). Although bankruptcy courts may not enter final orders in non-core proceedings absent consent of the parties, the order of attachment at issue in this motion is not a final order, but is interlocutory. *See* Lopez v. Casal, 998 F.2d 28, 31 (1st Cir. 1993); Merrimac Corp. v. Sved, 128 B.R. 874, 875 (S.D.N.Y. 1991). It is well established that bankruptcy courts may enter interlocutory orders in non-core proceedings. In re Trinsum Grp., Inc., 467 B.R. 734, 739-40 (Bankr. S.D.N.Y. 2012).

## Background

The facts set forth below are established by the record of this case and the evidence received at trial.

### A.  The Loan Defaults and Lawsuits

On March 5, 2015, Citibank began this action by filing a summons and complaint in Supreme Court, New York County (Index No. 650691/15) (the "State Court Action"), asserting twelve causes of action against Freidman and the other defendants. (Declaration of Robert Guttmann ("Guttmann Decl."), Ex. 1, ECF 56-1.) Plaintiff seeks (among other things) a judgment against Freidman as guarantor of  loans totaling $31.5 million extended by Citibank to entities closely held by Freidman. Three loans are at issue: a $10 million loan to eight LLCs

owned by Freidman (the "$10 Million Loan Borrowers"), evidenced by notes dated February 1, 2013; a $21 million loan to fourteen corporations and LLCs owned by Freidman (the "$21 Million Loan Borrowers"), evidenced by notes dated December 20, 2012; and a $1.5 million loan evidenced by a note dated July 1, 2013 to Taxi Club Management Inc., a corporation owned by Freidman (respectively, the "$10 Million Loan," the "$21 Million Loan" and the "$1.5 Million Loan," and collectively the "Loans"). (Affidavit of Charles Nigro, attached to the December 3, 2015 Declaration of Brett Berman, ECF 62 (the "Nigro Aff."), ¶¶7-31, ECF 62-1; Nigro Aff., Ex. C, ECF 62-4–ECF 62-5; Nigro Aff., Ex. I, ECF 62-17–ECF 62-18; Nigro Aff., Ex. M, N, ECF 62-25–62-26 .) [2]

The $10 Million Loan is secured by taxi medallions owned by the $10 Million Loan Borrowers, and the $21 Million Loan is secured by taxi medallions owned by the $21 Million Loan Borrowers (collectively, the "Medallion Collateral"). (Nigro Aff., ¶¶12, 20, ECF 62-1; Nigro Aff., Ex. J, ECF 62-19–ECF 62-21; Nigro Aff., Ex.D, ECF 62-6–ECF 62-10.)[3] In addition to pledging the Medallion Collateral as security for the $10 Million Loan and $21 Million Loan, the Medallion Loan Borrowers pledged the Medallion Collateral as security for the $1.5 Million Loan. (Nigro Aff., ¶¶ 27,30, ECF 62-1; Nigro Aff., Ex. R, ECF 62–30; Nigro Aff., Ex. O, ECF 62-27.) Each of the Loans is guaranteed by Freidman. (Nigro Aff., ¶¶ 14, 22, 29, ECF 62-1; Nigro Aff. Ex. F, ECF 62-12–ECF 62-14; Nigro Aff., Ex. L, ECF 62-23–ECF 62-24; Nigro Aff., Ex. Q, ECF 62-29.)

---

[2] The $10 Million Loan Borrowers are Bourbon Taxi LLC, Butterfly Taxi LLC, Chianti Taxi LLC, France Taxi LLC, Hypnotic Taxi LLC, Merlot Taxi LLC, Pinot Noir Taxi LLC, and Vodka Taxi LLC; the $21 Million Loan Borrowers are Bombshell Taxi LLC, Candy Apple Taxi LLC, Chopard Taxi Inc., Cupcake Taxi LLC, Dorit Transit Inc., Hennessy Taxi Inc., Iceberg Taxi Inc., Marseille Taxi LLC, Milky Way Cab Corp., Palermo Taxi Inc., Pointer Taxi Inc., Pudding Taxi LLC, Stoli Taxi Inc. and Vsop Taxi Inc..

[3] The $21 Million Loan Borrowers and $10 Million Loan Borrowers may be referred to in this opinion as the "Medallion Loan Borrowers" or "Debtors," and together with the borrower of the $1.5 Million Loan, Taxi Cab Management Inc., as "Borrowers."

Each of the Loans had a payment due on December 1, 2014, which was not made, and on December 4, 2014 Citibank declared a default and accelerated the Loans. (Nigro Aff., ¶¶42-43, ¶¶ 50-52, ECF 62-1.) On December 31, 2014, the $1.5 Million Loan matured. (Nigro Aff., ¶¶ 44-45, ECF 62-1; Nigro Aff., Ex. M, N, ECF 62-25–62-26.) Failure to pay the $1.5 Million Loan triggered a further default with respect to the $10 Million Loan and the $21 Million Loan, and Citibank gave notice of this default to all of the Borrowers, as well as to Freidman in his capacity as guarantor. (Nigro Aff., ¶¶54-55, ECF 62-1; Nigro Aff., Ex. Z, ECF 62-45.) The $10 Million Loan matured on January 31, 2015, and the failure to pay at that time constituted an additional default with respect to the $10 Million Loan. (Nigro Aff., ¶¶ 57-58, ECF 62-1; Nigro Aff. Ex. I, ECF 62-17–62-18.)

On April 24, 2015, in relation to a separate indebtedness, Capital One Taxi Medallion Finance, a trade name for All Points Capital Corp., N/K/A Capital One Equipment Finance Corp. ("Capital One"), filed an affidavit of judgment by confession, signed August 14, 2014 by Freidman, which resulted in a judgment by confession entered on July 10, 2015, in favor of Capital One against Freidman in the amount of $8,484,949.30. (Citibank Stmt. Re. Trial Exs., Ex. 12, ECF 48-12.)

In the State Court Action, on May 19, 2015, Justice Jeffrey K. Oing ("Justice Oing") granted Citibank's motion for an order of seizure ("Seizure Order"), allowing Citibank to seize the Medallion Collateral. (Guttmann Decl., Ex. 4,  ECF 56-4.) The Seizure Order was entered on June 12, 2015. The same day, a separate order was entered in the State Court Action denying Defendants' application for a stay of the Seizure Order. (December 2, 2015 Declaration of Brett Berman ("Berman Decl."), Ex. Q, ECF 54-18.)

On June 15, 2015, the Appellate Division, First Department entered an order granting a temporary stay of the Seizure Order pending a hearing by a full panel. (Berman Decl., Ex. U, ECF 54-32.)  On  July 14, 2015, the Appellate Division granted a stay of the Seizure Order on condition that Defendants post a $50 million bond. (Berman Decl., Ex. W, ECF 54-36.) No bond was posted, and on July 22, 2015, the twenty-two Medallion Loan Borrowers filed these chapter 11 bankruptcy cases in the Eastern District of New York.  These cases have been consolidated for procedural purposes and are jointly administered as In re Hypnotic Taxi,  Case No. 15-43300. (ECF 26, Case No. 15-43300.) The commencement of these bankruptcy cases automatically stayed enforcement of the Seizure Order. 11 U.S.C. §362(a).

On July 29, 2015, the Debtors removed the State Court Action to the United States District Court for the Southern District of New York, and after transfer to the United States District Court for the Eastern District of New York, the action was referred to this Court by order dated October 28, 2015. (Notice of Removal, ECF 1; Eastern District of New York Docket, p.17, ECF 1-1.)

B.  The Transfers

In April 2015, after Citibank commenced the State Court Action, and in the same month that Capital One entered the affidavit for judgment by confession, Freidman sought the advice of a trust and estates lawyer, Michael Zimmerman, to whom he had been referred by his long time lawyer in other matters,  Ellen Walker. (Transcript of November 30, 2015 Hearing ("November 30 Tr."), ECF 66, p.33, ln.1-3, p.123, ln.12-16.) At trial, Freidman acknowledged that he was motivated to consult Zimmerman for "trust and estate and tax purposes…and for liability purposes." (November 30 Tr., ECF 66, p.95, ln. 15-25, p.96, ln. 1.) Zimmerman similarly testified that Freidman came to him for estate planning and asset protection. (November 30 Tr.,

ECF 66, p.34, ln. 6-10.) This consultation led to the creation of four separate trusts,  the Kelly

Funding Trust and the Birkin Funding Trust, both located in the Cook Islands, the Evelyn

Funding Trust, located in Belize, and the Lindy Funding Trust, located in Nevis (the "Kelly

Trust," the "Birkin Trust," the "Evelyn Trust," and the "Lindy Trust"; and collectively the

"Trusts")[4]. (November 30 Tr., ECF 66,  p. 34, ln. 18-25, p.35 ln. 1; Affidavit of Evgeny

Freidman ("Freidman Aff."), ¶ 3, ECF 18; Kelly Trust, p.GF000352; Birkin Trust, p.GF000078;

Evelyn Trust, p.GF000160; Lindy Trust, p.GF000248.)

Into the Trusts, governed by substantially similar trust documents, Freidman placed his

interests in LLCs and corporations owning all of his personal residences and investment real

estate holdings in the United States ("Real Estate Entities"). (November 30 Tr., ECF 66, p.64, ln.

5-9, p. 121, ln. 18-25, p.124, ln. 2-25, p.125, ln. 1-25, p. 126, ln.1-25, p. 127, ln. 1-25, p. 128, ln.

1-15; Evelyn Trust, p.GF000172; Declaration of Nathan Schwed ("Schwed Decl."), ECF 4-1,

¶12; Schwed Decl., Ex. H, ECF 4-10–ECF 4-11; Citibank Stmt. Re. Trial Exs ., Ex. 14, ECF 48-

14, Ex. 20, ECF 48-20.)

The residences owned by the Real Estate Entities are 136 E 65th Street, New York, NY;

200 E 66th Street,  New York, NY, unit A1101; and 108 Halsey Lane, Bridgehampton, NY

("Residences"). (Citibank Stmt. Re. Trial Exs ., Ex. 20, ECF 48-20.) In addition, Freidman

transferred to the Trusts his interest in twenty-eight entities, holding investment properties in

New York, Queens, Chicago, and Philadelphia (collectively, the "Investment Properties").

(Citibank Stmt. Re. Trial Exs ., Ex. 20, ECF 48-20.) The total value of Freidman's interests in

---

[4] Copies of the Trusts were not filed on the docket but were received in evidence. The Trusts are identified by
Defendants' Bates stamp numbers as follows: Kelly Trust, GF000276-GF000357; Birkin Trust, GF000001-
GF000083; Evelyn Trust, GF000084-GF000172; Lindy Trust, GF 000173-000275.

the Real Estate Entities exceeds $60 million. (November 30 Tr., ECF 66, p. 121, ln. 18-25, p.124, ln. 2-25, p.125, ln. 1-25, p. 126, ln.1-25, p. 127, ln. 1-25, p. 128, ln. 1-15; Evelyn Trust, p.GF000172.)

The purpose of these transfers goes to the heart of Citibank's application for an order of attachment.

C.  The Proceedings in This Court

On November 5, pursuant to CPLR 6210, Citibank moved by order to show cause for a temporary restraining order and order of attachment, seeking to restrain any transfer of assets in which Freidman has an interest and to restrain any further transfer of assets transferred by Freidman to the Trusts. (Mot. for Order of Attach. and Temporary Restraining Order, ECF 4.) On November 5, a temporary restraining order ("TRO") was issued pursuant to CPLR 6210, restraining any transfers of Freidman's property or property of the Trusts not in the ordinary course of business. (Order to Show Cause and TRO, ECF 6.) On November 12, 2015 a hearing was held on Citibank's motion for an order of attachment, at which it was disclosed that the trustees of the Trusts (Ellen Walker, Edward Mermelstein, and Everett Abitbol (collectively, the "Trustees")) had resigned following the issuance of the TRO. (Transcript of November 12, 2015 Hearing, Case No. 15-43300, ECF 116, p.8, ln. 2-7, p.33, ln. 5-9.) On November 13, 2015 the Court was informed that Freidman had appointed, as successor trustees for all of the Trusts, two individuals located in Moscow. (Letter Providing Notice, ECF 24.) On November 17th, an Order of Attachment (ECF 28) and an Amended TRO (ECF 29) were entered in favor of Citibank. On November 19th, the Order of Attachment was stayed pending a hearing. (Stay of Order of Attach., ECF 34.) On November 30th, an evidentiary hearing was held on Citibank's motion for an order of attachment at which  Mr. Zimmerman, the lawyer who drafted the Trusts, testified,

along with one of the original trustees of the Kelly Trust, Edward Mermelstein. (November 30

Tr., ECF 66.) Freidman also testified, providing testimony that, on the whole, lacked credibility.

## Legal Standard

"Prejudgment attachment is a provisional remedy to secure a debt by preliminary levy

upon the property of the debtor in order to conserve that property for eventual execution." <u>DLJ</u>

<u>Mortgage Capital, Inc. v. Kontogiannis</u>, 594 F. Supp. 2d 308, 318 (E.D.N.Y. 2009) (citing

<u>Monteleone v. Leverage Group</u>, No. 08–CIV–1986, 2008 WL 4541124, at *6 (E.D.N.Y. Oct. 7,

2008); <u>Michaels Elec. Supply Corp. v. Trott Elec. Inc.</u>, 231 A.D.2d 695, 647 N.Y.S.2d 839 (2d

Dep't 1996)). Fed. R. Civ. P. 64, made applicable in adversary proceedings by Bankruptcy Rule

7064, permits a federal court to issue an order of attachment in the manner provided by the law

of the state in which the federal court sits. <u>DLJ Mortgage Capital, Inc. v. Kontogiannis</u>, 594 F.

Supp. 2d 308, 318 (E.D.N.Y. 2009).

Under CPLR 6212(a), for an order of attachment to be granted or confirmed, a plaintiff

is required to show, by affidavit and other written evidence, (1) that there is a cause of action and

that it is probable that the plaintiff will succeed on the merits; (2) that one of the grounds for

attachment provided in CPLR 6201 exist; and (3) that the amount demanded from the defendant

exceeds all counterclaims known to the plaintiff.

CPLR 6201, as relevant here, provides:

> An order of attachment may be granted in any action, except a
> matrimonial action, where the plaintiff has demanded and would
> be entitled, in whole or in part, or in the alternative, to a money
> judgment against one or more defendants, when:…
> 3. the defendant, with intent to defraud his creditors or frustrate the
> enforcement of a judgment that might be rendered in plaintiff's
> favor, has assigned, disposed of, encumbered or secreted property,
> or removed it from the state or is about to do any of these acts;…

CPLR 6201(3).

CPLR 6201 provides that an order of attachment "may" be granted, and for this reason, courts have held that fulfillment of the requirements of CPRL 6201 is a necessary but not a sufficient condition for granting an order of attachment. <u>Capital Ventures Int'l v. Republic of Argentina</u>, 443 F.3d 214, 221 (2d Cir. 2006). In addition, it is necessary to show there is a need for the order of attachment. <u>Id.</u> at 221-23 ("In sum, then, a motion court presented with an application for an order of attachment must determine whether a statutory ground for attachment exists, whether the applicant has established a likelihood of success on the merits, and whether the remedy is needed to secure payment or obtain jurisdiction.").

<b>Discussion</b>

A.  <u>Is Citibank Entitled to an Order of Attachment?</u>

To determine whether  an order of attachment is appropriate in this proceeding, each prong of CPLR 6212(a) will be analyzed separately.

1.  <u>That there is a cause of action, and that it is probable that the plaintiff will succeed on the merits.</u>

Citibank points out that prior to the removal of the State Court Action, Justice Oing issued the Seizure Order under CPLR 7102, which requires, among other things, a finding that "it is probable that the plaintiff will succeed on the merits." CPLR 7102(d)(1); (Guttmann Decl., Ex. 4,  ECF 56-4.) Citibank argues this finding is law of the case. (November 30 Tr., ECF 66, p.12, ln. 5-15.)

Law of the case applies to matters expressly decided "as well [as] to everything decided by necessary implication."  <u>United States v. Yonkers Bd. of Educ.</u>, 856 F.2d 7, 11 (2d Cir. 1988) (citation omitted).  Law of the case will generally be followed "absent 'cogent' or 'compelling' reasons." <u>Id.</u> (citing <u>Doe v. New York City Dep't of Soc. Servs.</u>, 709 F.2d 782, 789 (2d Cir.),

9

*cert. denied sub nom.* Catholic Home Bureau v. Doe*, 464 U.S. 864, 104 S.Ct. 195, 78 L.Ed.2d

171 (1983)). "It is not enough for the party seeking reconsideration to make a more persuasive

argument." United States v. Yonkers Bd. Of Educ., 856 F.2d at 11 (citing Fogel v. Chestnutt, 668

F.2d 100, 109 (2d Cir. 1981)). A court need not reconsider findings which are law of the case

absent "'an intervening change of controlling law, the availability of new evidence, or the need

to correct a clear error or prevent manifest injustice.'" United States v. Yonkers Bd. of Educ.,

856 F.2d 7, 11 (2d Cir. 1988) (citing Doe v. New York City Dep't of Soc. Servs, 709 F.2d at 789

(quoting 18 C. Wright, A. Miller & E. Cooper, Federal Practice and Procedure § 4478, at 790

(1981) (footnote omitted))). The pendency of an appeal, absent a stay, does not affect the status

of a finding as law of the case. Cty. of Suffolk v. Long Island Lighting Co., 710 F. Supp 1428,

1442 (E.D.N.Y. 1989) (law of the case is binding "unless it is reversed on appeal") (*rev'd in part

on other grounds* by Cty. of Suffolk v. Long Island Lighting Co., 907 F.2d 1295, 1300 (2d Cir.

1990)); *accord*, Todd v. Russell, 1 F. Supp. 788, 790 (S.D.N.Y. 1932) ("[U]nless and until [a

holding is] reversed by an appellate court, [it] is the law of the case.").

Application of law of the case is not mandatory; it is "a discretionary doctrine which

'does not constitute a limitation on the court's power but merely expresses the general practice of

refusing to reopen what has been decided.'" United States v. Yonkers Bd. of Educ., 856 F.2d 7,

11 (2d Cir. 1988) (citing United States v. Birney, 686 F.2d 102, 107 (2d Cir.1982) (quoting

Slotkin v. Citizens Cas. Co., 614 F.2d 301, 312 (2d Cir.1979), *cert. denied,* 449 U.S. 981, 101

S.Ct. 395, 66 L.Ed.2d 243 (1980))). Whether or not given effect as law of the case, Justice

Oing's finding, implicit in the issuance of the Seizure Order, that it is probable that Citibank will

succeed on the merits, is correct. It is clear that Citibank has made a showing of probability of

success which meets the requirements in CPLR 6212(a).

To establish probability of success on the merits under CPLR 6212(a), a plaintiff must show that it is more likely than not that it will succeed on the merits of its claim. DLJ Mortgage Capital, Inc. v. Kontogiannis, 594 F. Supp. 2d 308, 319 (E.D.N.Y. 2009) (citing New York Dist. Council of Carpenters Pension Fund v. KW Const., Inc., No. 07- CIV-8008 (RJS), 2008 WL 2115225, at *1 (S.D.N.Y. May 16, 2008)). This requires "proof stronger than that required to establish a prima facie case." Id. However, in evaluating whether this standard has been met, a court must afford the plaintiff the benefit of all legitimate inferences than can be drawn in plaintiff's favor. JSC Foreign Econ. Ass'n Technostroyexport v. Int'l Dev. & Trade Servs., Inc., 306 F.Supp.2d 482, 485 (S.D.N.Y.2004); Bank Leumi Trust Co. of New York v. Istim, Inc., 892 F. Supp. 478, 482 (S.D.N.Y. 1995) (quoting Marklin v. Drew Properties Corp., 280 F.Supp. 176, 179 (S.D.N.Y.1967) ("[T]he court must give the plaintiff the benefit of all the legitimate inferences that can be drawn from the stated facts.")).

Freidman is unconditional guarantor of payment when due of the $1.5 Million Loan, pursuant to a guaranty dated July 1, 2013. (Nigro Aff., ¶ 29 ECF 62-1; Nigro Aff., Ex. Q, ECF 62-29.) Freidman executed similar guarantees, dated January 31, 2012, of the $10 Million Loan, and executed guarantees, dated December 20, 2012, of the $21 Million Loan. (Nigro Aff., ¶¶ 14, 22, ECF 62-1; Nigro Aff. Ex. F, ECF 62-12–ECF 62-14; Nigro Aff., Ex. L, ECF 62-23–ECF 62-24.)

All of the Medallion Loan Borrowers executed guarantees of the $1.5 Million Loan dated July 1, 2013. (Nigro Aff., ¶¶ 27,30, ECF 62-1; Nigro Aff., Ex. R, ECF 62–30; Nigro Aff., Ex. O, ECF 62-27.) Default under the $1.5 Million Loan permits acceleration of that loan. (Nigro Aff., ¶¶40-41, ECF 62-1.) Acceleration of the $1.5 Million Loan triggers liability on the guarantees by Freidman and the Medallion Loan Borrowers. (Nigro Aff., ¶54, ECF 62-1.) In turn, default on

the guarantees by the Medallion Loan Borrowers places those entities in default, permitting acceleration of the $10 Million Loan and the $21 Million Loan. (Nigro Aff., ¶54, ECF 62-1.) Acceleration of the Loans triggers Freidman's liability under his guarantees. (Nigro Aff., ¶54, ECF 62-1.)

Each of the Loans had a monthly payment due on December 1, 2014 which was not paid, and on December 4, 2014 Citibank declared defaults and accelerated each of the Loans. (Nigro Aff., ¶¶42-43, ¶¶ 50-52, ECF 62-1.)  The $1.5 Million Loan matured on December 31, 2014. (Nigro Aff., ¶44, ECF 62-1; Nigro Aff., Ex. M, N, ECF 62-25–62-26.) Upon the failure to pay the $1.5 Million Loan at maturity, Citibank declared a further default with respect to the $10 Million Loan and $21 Million Loan and gave notice of default and acceleration to all of the Medallion Loan Borrowers as well as to Freidman as guarantor. (Nigro Aff., ¶¶54-55, ECF 62-1; Nigro Aff., Ex. Z, ECF 62-45.) The $10 Million Loan matured on January 31, 2015 and was not paid, constituting an additional default with respect to the $10 Million Loan. (Nigro Aff., ¶¶57-58, ECF 62-1; Nigro Aff. Ex. I, ECF 62-17–62-18.)

It is clear that the showing of likelihood of success required for an order of attachment is met. Freidman does not dispute the basic fact that the Loans were advanced and have not been repaid, and that he guaranteed the Loans. While Defendants have alleged that the Borrowers' failure to make the payments due on December 1, 2014 resulted from errors by Citibank in handling accounts of the Borrowers' affiliates, and that the acceleration based on that default was therefore improper, they have not disputed the fact that the  $1.5 Million Loan matured on December 31, 2014. (Berman Decl., Ex. I , ECF 54-9.) Given the failure to pay the $1.5 Million Loan at maturity; the resulting acceleration of the $10 Million Loan and the $21 Million Loan;

and Freidman's liability as guarantor of the Loans, this argument does not alter the conclusion that Citibank has made a sufficient showing of likelihood of success under CPLR 6212(a).

    2. <u>That one of the grounds for attachment provided in section 6201 exist.</u>

    The second requirement for obtaining an order of attachment under CPLR 6212(a) is that one or more grounds for attachment provided in CPLR 6201 exist. CPLR 6201, as relevant here, provides:

> An order of attachment may be granted in any action, except a matrimonial action, where the plaintiff has demanded and would be entitled, in whole or in part, or in the alternative, to a money judgment against one or more defendants, when:...
> 3. the defendant, with intent to defraud his creditors or frustrate the enforcement of a judgment that might be rendered in plaintiff's favor, has assigned, disposed of, encumbered or secreted property, or removed it from the state or is about to do any of these acts;…

CPLR 6201(3).

    Because "[f]raudulent intent is rarely susceptible to direct proof,"  courts look to "badges of fraud" to establish actual intent.  <u>In re Kaiser</u>, 722 F.2d 1574, 1582 (2d Cir. 1983). However, "[f]raudulent intent is not lightly inferred; allegations raising a mere suspicion of fraud are insufficient to sustain attachment on this ground." <u>Algonquin Power Corp. v. Trafalgar Power Inc.</u>, No. 00–CIV-1246 (NPM/DEP), 2000 WL 33963085, at *11 (N.D.N.Y. Nov. 8, 2000) (citations omitted).

    Because "[f]raudulent acts are as varied as the fish in the sea," any list of the "badges of fraud" would be non-exhaustive. <u>In re Kaiser</u>, 722 F.2d 1574, 1583 (2d Cir. 1983). However, six telling badges of fraud are:

> (1) the lack or inadequacy of consideration;
> (2) the family, friendship or close associate relationship between the parties;

> (3) the retention of possession, benefit or use of the property in
> question;
> (4) the financial condition of the party sought to be charged both
> before and after the transaction in question;
> (5) the existence or cumulative effect of a pattern or series of
> transactions or course of conduct after the incurring of debt, onset
> of financial difficulties, or pendency or threat of suits by creditors;
> and
> (6) the general chronology of the events and transactions under
> inquiry.

*Kaiser,* 722 F.2d at 1582-83; <u>In re Boyer</u>, 328 F. App'x 711, 715 n.2 (2d Cir. 2009). In this case

all six of these badges of fraud are present. Each will be examined in turn.

1. *The lack or inadequacy of consideration.*

The transfer of Freidman's interests in the Real Estate Entities to the Trusts was a

gratuitous transfer; this badge of fraud is unquestionably present. (Freidman Aff., ECF 18, ¶15.)

2. *The family, friendship or close associate relationship between the parties;*

The beneficiaries of the Trusts are Freidman, his children, and his parents. (Kelly Trust,

p.GF000346, Third Schedule, p.65; Lindy Trust, p.GF000242, Third Schedule, p.64; Evelyn

Trust, p.GF000154, Third Schedule, p.64; Birkin Trust, p.GF000072, Third Schedule, p.66.)

This badge of fraud is unquestionably present as well.

3. *The retention of possession, benefit or use of the property in question.*

The evidence establishes the presence of this badge of fraud.

First of all, Freidman has structured the Trusts so that he reserves the right to continue to

use the  properties, including the Residences, owned by the Real Estate Entities he transferred to

the Trusts. The trust deeds of all of the Trusts provide that:

> The Trustees, with the written consent of the Protector, shall have
> power to permit a Discretionary Beneficiary to occupy, use or
> enjoy personally any movable or immovable property which may,

> for the time being, be comprised in the Trust Fund upon any terms
> and conditions which the Trustees may think fit.

(Evelyn Trust, p.GF000111, ¶17, p.23; Lindy Trust, p.GF0002000, ¶17, p.23; Kelly Trust,

p.GF000303, ¶17, p.23; Birkin Trust, p.GF000029-000030, ¶17, p.24-25 .) All of the Trusts

designate Freidman as both the Protector and a Discretionary Beneficiary. (Evelyn Trust,

p.GF000154, Third Schedule, p.64; Evelyn Trust, p.GF000158, Seventh Schedule, p.68; Birkin

Trust, p.GF000072, Third Schedule, p. 66; Birkin Trust, p.GF000076,  Seventh Schedule p.70;

Kelly Trust, p.GF000346, Third Schedule p. 65; Kelly Trust, p.GF000350, Seventh Schedule p.

69; Lindy Trust p.GF000242, Third Schedule, p.64; Lindy Trust , p.GF000246, Seventh

Schedule, p.68.)  Furthermore, the Protector is empowered to remove and replace the Trustees at

any time. (Evelyn Trust, p.GF000122, ¶ 35(d), p.34; Lindy Trust, p.GF000211, ¶ 35(d), p. 34;

Birkin Trust, p.GF000040-000041, ¶ 35(d), p.35-36; Kelly Trust, p.GF000314-GF000315, ¶

35(d), p.34-35.)

        In addition, Freidman maintains management control over and use of the Investment

Properties in the same manner as he did prior to the transfer to the Trusts. Freidman testified at

trial that he never transferred to the Trustees signing authority over the bank accounts into which

the income from the Investment Properties is deposited. (November 30 Tr., ECF 66, p. 97, ln.

16-25, p. 98 ln. 1-8, p. 109, ln. 21-25. P. 110, ln. 1-2.) Freidman continues to exercise that

authority. (November 30 Tr., ECF 66, p. 98, ln. 4-6.) Edward Mermelstein, an original trustee of

the Kelly Trust, testified that, until his deposition was taken in this proceeding, he did not know

that the Kelly Trust contained assets other than $20 transferred when the Kelly Trust was

created; had no management responsibility with respect to any real properties; and does not

know whether the LLCs transferred to the Kelly Trust have bank accounts. (November 30 Tr.,

ECF 66, p.169, ln.15-25, p.170, ln. 1-25, p.171, ln. 1-18.) Likewise, Ellen Walker, an original

trustee of all four Trusts, testified at her deposition that, in her role as trustee, she has never

handled any funds of any of the Trusts; had no part in managing any of the properties owned by

the Real Estate Entities; did not know if any of the properties had rent paying tenants, did not

know whether they are managed by real estate management companies, has not spoken to any

real estate management company; has engaged no professionals to do anything related to the

properties owned by the Real Estate Entities; has not negotiated or engaged anyone to deal with

tax liens on the properties; does not know if any property is managed by a super; and has not

communicated with any super. (Deposition of Ellen Walker ("Walker Dep."), p.92, ln.15-25,

p.93, ln. 1-25, p.95 ln.1-5.)

Confronted with the fact that he seems to have maintained total control over the

Investment Properties, Freidman testified that he is "in the process" of handing over control.

(November 30 Tr., ECF 66, p.116,  ln.13-25, p.117, ln. 1-25, p.118 ln.1-20.) When asked, "So in

the meantime until all those violations, et cetera, get cleaned up you're in charge of the accounts;

right?" Freidman evaded the questions and explained that he was very interested in the Trusts

because they are for the benefit of his children, and reiterated that he was "working diligently to

hand over control," though five and half months had already elapsed since the properties were

transferred to the Trusts. (November 30 Tr., ECF 66, p.118, ln. 21-25, p.119,  ln. 1-5.)

Properties located at 48-02 Van Dam Street, Long Island City, NY 11101 and 44-07

Vernon Boulevard, Long Island City, NY 11101, used as business premises by Freidman's

affiliated taxi cab management companies, continued to be used in the same manner by those

entities after the transfers, without paying rent. (November 30 Tr., ECF 66, p.113, ln.1-19.)

It appears that no change in the use of the Residential Properties or the use or management of the Investment Properties was effectuated by the transfers to the Trusts. Therefore, this badge of fraud is present as well.

4. *The financial condition of the party sought to be charged both before and after the transaction in question.*

It is not necessary to find that Freidman was rendered insolvent by these transfers in order to conclude that the transfers were made with intent to defraud creditors or to frustrate the enforcement of a judgment. What is telling is that, by these transfers, Freidman appears to have sought to convey all of his property against which a judgment creditor could readily execute.

Freidman maintains that his Statement of Financial Condition dated June 30, 2015 ("2015 SFC") demonstrates that even after the transfers he was in robust financial shape. (November 30 Tr., ECF 66, p. 282, ln. 6-9; Freidman Aff., Ex. B, ECF 18-2.) The 2015 SFC lists a net worth of almost $130 Million. (Freidman Aff., Ex.B, p. 4, ECF 18-2.) However, even a cursory analysis shows that, notwithstanding this purported net worth, Freidman retains few assets from which a potential judgment creditor might readily recover.

Of the purported net worth of $130 million shown on the 2015 SFC, $85 million is ascribed to closely held entities owning taxi medallions. (Freidman Aff., Ex.B, p. 4, ECF 18-2.) These medallions are all encumbered. (Freidman Aff., Ex.B, p. 5-7, ECF 18-2.) Freidman's equity in closely held entities owning New York City taxi medallion rights ("NYC Medallions") is listed on the 2015 SFC as approximately $70 Million of the $85 million total equity attributable to taxi medallions. (Freidman Aff., Ex.B, p. 4, ECF 18-2.) It is clear, therefore, that value attributable to entities owning taxi medallions listed on the 2015 SFC is dependent on the

market value of the NYC Medallions. Furthermore, because the NYC Medallions are heavily

encumbered (Freidman's reported $70 million of equity in NYC Medallions is the result of

subtracting $185 million in encumbrances from $255 million total value listed on the 2015 SFC),

any decline in the market value of the NYC Medallions will effect Freidman's equity

disproportionally. (Freidman Aff., Ex.B, p. 6, ECF 18-2.) For example, if the value of the NYC

Medallions were to decline by 10%, or $25.5 million, Freidman's equity would decline by over

one-third.

NYC Medallions are illiquid. (Berman Decl., Ex. L, ¶¶13, 21, ECF 54-13.) Very few

NYC Medallions actually trade.  (Berman Decl., Ex. L, ¶15, ECF 54-13.) The last transfer of

corporate unrestricted medallions, the type of medallion at issue here, with a price reported,

before Freidman's June 2015 SFC, occurred in March, 2015. (http://www.nyc.gov/html/tlc/

html/about/medallion_transfers.shtml last visited December 9, 2015.)  Given the lack of a liquid

market for these assets, it is not possible to readily determine the market value of a New York

City taxi medallion.

According to Defendants, whatever the market value of a single medallion, if a creditor

were to execute on Freidman's interests in the Medallion Collateral and sell the medallions as a

group into the market, there is no telling where the bottom would be. (Berman Decl., Ex. L,

¶¶20-23, ECF 54-13.) This has been repeatedly stressed in pleadings and affidavits submitted by

Defendants at every stage of this litigation. (Berman Decl., Ex. L, ¶¶20-23, ECF 54-13;

Guttmann Decl., Ex 6, ¶¶17,19 ECF 56-9; Berman Decl., Ex.P, p.7, ECF 54-17.)  Henry Debbas,

Chief Executive Officer and Chief Investment Officer at Galactus Investing LLC, whose

affidavit was submitted in the State Court Action in opposition to the Seizure Order, described

the likely result of allowing Citibank to seize the Medallion Collateral as follows: "the consequence of introducing such substantial numbers of new medallions into the market would be to immediately destroy the value of medallions, including those medallions that represent Citibank's collateral, because it will prove impossible to find that many buyers for an already illiquid asset." (Berman Decl., Ex. L, ¶21, ECF 54-13.)

In his affidavit pursuant to EDNY LBR 1007-4, submitted in connection with these bankruptcy cases, Freidman reiterated this assessment of the likely impact on the value of New York City taxi medallions if Citibank were permitted to sell the Medallion Collateral:

> The impact of a fire sale liquidation of so many medallions would
> likely cause a massive devaluation of all NY City medallions,
> resulting in more defaults by other taxi operators and perhaps
> cause a collapse of the entire industry.

(Affidavit of Evgeny Freidman dated July 21, 2015, filed on docket of 15-43300 as ECF 2, ¶ 30.) Upon obtaining a judgment against Freidman, Citibank would be able to seek to execute on all of Freidman's interests in the NYC Medallions, except the medallions owned by the Debtors (assuming the automatic stay is in effect at that time). If Debbas and Freidman are correct in their warnings concerning the effect of liquidation of the 46 medallions owned by the Debtors, presumably the wholesale liquidation of Freidman's interests in the remainder of the NYC Medallions (numbering 223 according to the 2015 SFC) would have an even more significant impact on the market value of this type of asset. (Freidman Aff., Ex. B, p.5-6, ECF 18-2.)

The second major source of value listed on the 2015 SFC is Freidman's interest in closely held taxi cab management companies ("Management Companies"), which are listed as worth $34,880,000. (Freidman Aff., Ex. B, p.4, ECF 18-2.) Here, again, it is highly doubtful that these assets would actually be a significant source of recovery to a creditor seeking to execute on a

judgment. Freidman's testimony on this topic can only be described as self-contradictory, evasive and unconvincing. Though he initially stated that the Management Companies would be worth more in liquidation than as a going concern (November 30 Tr., ECF 66, p. 229, ln. 9-18), this assertion collapsed under cross examination. Freidman testified that a substantial number of the taxis managed by the Management Companies are owned by entities controlled by Mr. Freidman; that there is no contract in place that would require these owners to remain with the Management Companies; and that in fact such a requirement would be illegal based on his understanding of existing regulations (November 30 Tr., ECF 66, p.236, ln.14-25, p. 237, ln.1-12.) Freidman also testified that the value of the Management Companies is substantially enhanced by his large vertically integrated operation,  his personal management skill, and the fact that his holdings comprise a large percentage of the total New York City taxi cab market. (November 30 Tr., ECF 66, p.230, ln. 17-25, p. 231 ln. 1-8, p.237, ln.20-25, p. 238, ln. 1-20, p. 243, ln. 9-25, p.244, ln.1-17.) However, any value attributable to his management, his market share, or the superiority of the integrated operation he has built, is precisely the type of value that would disappear when a judgment creditor tried to sell these companies. Thus, just as in the case of the NYC Medallions, the net worth that Freidman purports to demonstrate by virtue of his ownership of the Management Companies is not something that can be valued highly from the perspective of a creditor seeking to realize on collateral.

The other assets listed in Freidman's 2015 SFC are Swiss bank accounts totaling over $2 million, and two residences in France worth a total of $14 million. (Freidman Aff., Ex. B, p.4, ECF 18-2.) It is not clear what, if anything, the Swiss bank accounts currently contain; when Freidman was asked at the hearing, "the cash in Switzerland, is that still there now?" he replied "I'd have to check. I did not check before." (November 30 Tr., ECF 66, p.221, ln. 16-20.) In any

event, such property, like the residences in France, would be difficult for a creditor seeking to enforce a New York judgment to reach.

Thus, is appears that Freidman has transferred substantially all of his assets available for execution by a judgment creditor to the Trusts.  Much is made by Defendants of the fact that in connection with the creation of the Trusts, Freidman signed affidavits attesting that the transfers would not render him insolvent. (November 30 Tr., p.80, ln.18-25, p.81 ln.1-8; Freidman Aff., Ex. A, ECF 18-1.)  Such  self-serving affidavits are entitled to little, if any, weight and do not contradict the overwhelming circumstantial and documentary evidence that show that these transfers were undertaken to remove valuable assets from the reach of potential judgment creditors.

5. *The existence or cumulative effect of a pattern or series of transactions or course of conduct after the incurring of debt, onset of financial difficulties, or pendency or threat of suits by creditors,* and  6. *the general chronology of the events and transactions under inquiry.*

 Though fraudulent intent is rarely susceptible to direct proof, much can be inferred from the chronology of events. Citibank began this action in March 2015, and Freidman commenced the process of creating the Trusts in April, around the time that Capital One filed an affidavit for judgment by confession in state court. In May, pressure on Freidman intensified when Justice Oing issued the Seizure Order, permitting Citibank to seize the Medallion Collateral from the Medallion Loan Borrowers. (Guttmann Decl., Ex. 4,  ECF 56-4.) Then, in the middle of June, Freidman conveyed all his assets on which a judgment creditor would be able to execute to the four Trusts, registered in three different offshore locations.  As Trustees, Freidman appointed his business attorneys, who do not appear to have undertaken any action, or to have been apprised of any responsibility they had in that capacity. Furthermore, it does not appear that after the

transfers Freidman relinquished the use of the properties owned by the Real Estate Entities or relinquished control of the Investment Property bank accounts.

Freidman asserts that he undertook these transfers simply for estate planning purposes, a proposition that strains credulity. From the perspective of an inquiry into the presence of the badges of fraud, it is difficult to imagine a more arresting chronology. These transfers occurred against the background of a suit by Citibank to recover in excess of $40 million dollars, and a confession of judgment entered by Capital One, which resulted in a judgment of almost $8.5 million dollars. It is impossible to conclude that the timing of the transfers is merely coincidence.

Events after the TRO was issued by this Court strongly support the inference that Freidman undertook the transfers to the Trusts with the aim of frustrating judgment creditors. After this Court issued the TRO on November 5, 2015, Freidman fired the Trustees located in New York in order to appoint foreign trustees in Moscow, in a transparent attempt to further insulate the assets he placed in the Trusts from the reach of his creditors. (Citibank Stmt. Re. Trial Exs ., Ex.7, ECF 48-7, Ex. 8, ECF 48-8.) Freidman's testimony to the contrary is totally lacking in credibility and is directly contradicted by the deposition testimony of Ellen Walker, Freidman's lawyer and an original trustee of all four Trusts.

When asked if he was aware that the trustees of the Trusts, Mr. Mermelstein, Ms. Walker, and Mr. Abitol, had signed resignation letters following the issuance of the TRO, in November 2015, Freidman said he was. (November 30 Tr., ECF 66, p.87, ln. 10-19.) However, Freidman denied having played any part in their resignation:

> Q. "Did you communicate with them in any way about their
> resignations or terminations before they signed those letters?"
> A. "Absolutely not."
> Q. So you were surprised to learn that they had resigned?
> A. Not really usually surprised about anything. When you have a -

- sort of characterize it as an onslaught from Citibank in reference to these trusts. It wasn't surprising that the trustees didn't want any part of it. So was I disappointed? Yes, I was disappointed. Was I fully surprised? I can't say I was surprised.

Q. How did you become aware of their purported resignations?

A. I don't -- I don't fully remember but I knew -- I don't remember if it was an email or I saw a resignation letter or one of my attorneys told me but I knew that they had – they resigned.

(November 30 Tr., ECF 66, p.87, ln. 20-25, p. 88, ln.1-9.) Freidman testified that Mr.

Zimmerman told him of the resignations. (November 30 Tr., ECF 66, p. 89, ln. 9-10.) When

asked "And you hadn't told Mr. Zimmerman prior to that to suggest to the trustees that they

resign; right?" Freidman answered, "Absolutely not." (November 30 Tr., ECF 66, p. 89, ln. 11-

13.) When asked again, "Had you told Mr. Zimmerman or any of the trustees that you were

firing them?" Freidman answered, "Absolutely not." (November 30 Tr., ECF 66, p.89, ln. 14-

16.) When asked by his attorney, "It wasn't your intent, Mr. Freidman, in appointing these

Moscow trustees, as I'll casually refer to them, to somehow evade or hinder the TRO that was

issued by Judge Craig was it?" (November 30 Tr., ECF 66, p.202, ln. 21-24), Freidman answered

"…[s]o there was no intent to evade anything from the beginning of this….These trusts were set

up—these trusts were set up, the control was given over to the trustees for the benefit of my

children, my parents and children's mothers." (November 30 Tr., ECF 66, p.203, Ln. 8-12.)

　　　　Ellen Walker gave deposition testimony directly contradicting Freidman's concerning

her resignation as a trustee[5]. When asked "Why did you resign as trustee of the four trusts?" she

replied "Mr. Freidman fired me." (Walker Dep., p.31, ln.8-10.)  Ms. Walker was not sure

whether she received a communication to this effect directly from Mr. Freidman. (Walker Dep.,

---

[5] Ms. Walker was unavailable to testify at trial (ECF 48, Ex. 17). Her deposition testimony was received in evidence pursuant to Fed. R. Evidence 804 and Fed. R. Civ. P. 32. (November 30 Tr., ECF 66, p.274, ln. 1-2.)

p.32, ln.19-20) ("I may have received a communication from Gene.")[6] She testified she "believe[s] [she] was advised by Michael Zimmerman." (Walker Dep., p.32, ln. 17-18). When asked "Do you recall Mr. Zimmerman speaking with you about Mr. Freidman's decision to fire you as trustee?" she answered, "I believe we spoke." (Walker Dep., p.33, ln. 22-25.) She explained that Mr. Zimmerman told her that "the trustees were all being terminated and would be replaced by third parties." (Walker Dep., p. 34, ln. 15-16.) When asked "So, when you said Mr. Zimmerman told you the reason Mr. Freidman was terminating you, what is the reason Mr. Freidman is terminating you according to Mr. Zimmerman?" Walker answered "He chose to replace me with trustees outside of the United States." (Walker Dep, p. 37, ln. 20-25.) Finally, when asked about her prior testimony concerning the reason she was fired, "…you answered that one reason was he wanted trustees outside of the United States?" Walker testified, "I don't—I'm sorry, I don't think I said 'one reason.' That was the reason, as I recollect it." (Walker Dep., p.42, ln. 15-23.)

Freidman's denial that he directed the Trustees to submit resignation letters so that he could appoint foreign trustees is utterly lacking in credibility.

Defendants assert that Freidman recorded the transfers to the Trusts in the public record, despite not being required to do so, filed financial documents showing the transfers in his divorce proceedings, and sent updated financial statements to some of his creditors. (Mem. of Law in Opp'n to Mot., ECF 17, p. 13; Freidman Aff., ECF 18, ¶¶17-19.) Freidman's disclosure of these transfers after the fact does nothing to undercut the overwhelming evidence that they were undertaken with intent to frustrate enforcement actions by creditors.

In short, the badges of fraud are numerous and glaring, and CPLR 6201(3) is satisfied.

---

[6] "By Gene, you mean Mr. Freidman for the record?" "Yes." (Walker Dep., p.33, ln. 2-4.)

3. That the amount demanded exceeds all known counterclaims.

In determining whether the third requirement, that "the amount demanded from the defendant exceeds all counterclaims known to the plaintiff," is met, courts are to examine only counterclaims that the plaintiff concedes are just. Bank Leumi Trust Co. of New York v. Istim, Inc., 892 F. Supp. 478, 482 (S.D.N.Y. 1995) (collecting cases); Shearson Hayden Stone, Inc. v. Scrivener, 480 F. Supp. 256, 259, (S.D.N.Y. 1979) ("[W]e need consider only those counterclaims which the plaintiff is willing to concede as just. Plaintiff vigorously disputes the validity of defendant's counterclaim, and we therefore find that it has satisfied its burden as to the final requirement of New York's attachment statute."); Nat'l Audubon Soc., Inc. v. Sonopia Corp., No. 09- CIV-975 (PGG), 2009 WL 636952, at *3 (S.D.N.Y. Mar. 6, 2009) (because CPLR 6212(a) permits consideration of only the amount of potential counterclaims that a plaintiff concedes is just, an affirmation that the amount demanded in a complaint exceeds all known counterclaims is sufficient). "[T]he existence of a pending counterclaim which is contested does not defeat an attachment." American Jerex Co. v. Universal Aluminum Extrusions, Inc., 340 F. Supp. 524, 529 (E.D.N.Y. 1972) (citation omitted). "This is consistent with the principle that the Court should not reach the merits of a claim on a motion for attachment." City of New York v. Citisource, Inc., 679 F. Supp. 393, 399 (S.D.N.Y. 1988). The fact that Citibank does not concede the counterclaims are just is sufficient to allow Citibank to satisfy this requirement, consistent with the fact that an order of attachment is a provisional remedy.

Freidman contends that Citibank cannot simply make an "unsubstantiated assertion" that the amount demanded exceeds all counterclaims. (Def.'s Pre-Hr'g Stmt., p. 13-14, ECF 50; Mem. of Law in Opp'n to Mot., p.17-18, ECF 17.) In Citibank's memorandum of law, submitted

with this motion, Citibank avers, "[t]he pleadings in the action establish that "the amount demanded from the defendant is greater than the amount of all counterclaims known to plaintiff." (Mem. Of Law in Supp. of Mot., p.12, ECF 5.) The reply to counterclaims filed in the State Court Action, denying liability and asserting affirmative defenses to all counterclaims, is verified by Bernadette Walsh, Senior Vice-President of Citibank, who, "duly sworn," stated that the reply was, "true to her own knowledge, except as to those matters herein stated to be alleged upon information and belief, and that as to those matters, she believes them to be true." (Guttmann Decl., Ex. 3, p.23, ECF 56-3.) This is sufficient to make the showing required under CPLR 6212(a) that the amount demanded from the defendant exceeds all counterclaims known to the plaintiff.

4. <u>The need for the attachment.</u>

Having established that the statutory requirements are met, it is necessary to consider whether there is a need for an order of attachment. *See* <u>Capital Ventures Int'l v. Republic of Argentina</u>, 443 F.3d 214 221-223 (2d Cir. 2006). The need for attachment has been amply demonstrated by the overwhelming evidence that Freidman made transfers to the Trusts in an effort to strip himself of assets a judgment creditor could readily execute on.

Freidman argues that Citibank does not need an order of attachment, pointing out that Citibank holds the Medallion Collateral as security for its claims against the Medallion Borrowers. Freidman points to the affidavit of Charles Nigro, a Director of Citibank, filed in support of Citibank's motion for an order allowing seizure of the Medallion Collateral, where Citibank requested that any bond the Medallion Borrowers be allowed to post in lieu of seizure be set at at least $37 million, the "estimated" value of the Medallion Collateral. (Nigro Aff., ¶ 72, ECF 62-1.)

The fact that Citibank's claims against the Medallion Borrowers are secured by the Medallion Collateral does not undercut its demonstration of need for an order of attachment. First of all, there is no evidence in the record of the current value of the Medallion Collateral. Second, whatever the value of the Medallion Collateral, Citibank is stayed from proceeding against it. Instead, Citibank is proceeding on its claims against Freidman, as guarantor, as it is entitled to. These claims are unsecured, and the record on this motion clearly establishes the need for attachment to prevent any further transfer of assets by Freidman.

Accordingly, the order of attachment is granted, and the stay of the order of attachment entered November 19, 2015 (ECF 34) is dissolved.

B. What Assets Can Citibank Attach?

1. Can an order of attachment issued in this proceeding reach property transferred by Freidman to the Trusts?

Defendant maintains that property transferred to the Trusts cannot be reached by an order of attachment against Freidman because he no longer has an interest in that property. As a general matter, an order of attachment may not reach property in which the defendant does not have an interest. The cases cited by Freidman's attorneys in their opposition to the motion reiterate this basic proposition. E.g., Sigmoil Res., N.V. v. Pan Ocean Oil Corp. (Nigeria), 234 A.D.2d 103, 104, 650 N.Y.S.2d 726, 727 (1st Dep't 1996), Bank of New York v. Nickel, 14 A.D.3d 140, 145, 789 N.Y.S.2d 95 (1st Dep't 2004), Sidwell & Co. v. Kamchatimpex, 166 Misc. 2d 639, 644, 632 N.Y.S.2d 455 (Sup. Ct. NY Cty. 1995).  However, these cases are inapposite because they address whether an order of attachment can reach property transferred in the ordinary course.  Where, as in this case, intent to hinder, delay or defraud creditors is shown, a different rule applies.  Section 278 of the N.Y. Debt. & Cred. Law provides:

> 1. Where a conveyance or obligation is fraudulent as to a creditor, such creditor, when his claim has matured, may, as against any person except a purchaser for fair consideration without knowledge of the fraud at the time of the purchase, or one who has derived title immediately or mediately from such a purchaser,
>
> a. Have the conveyance set aside or obligation annulled to the extent necessary to satisfy his claim, or
>
> b. Disregard the conveyance and attach or levy execution upon the property conveyed.

N.Y. Debt. & Cred. Law § 278. Thus, section 278(b) expressly states that in the case of a fraudulent transfer, property can be attached in the hands of a third party (other than a bona fide purchaser, an exception not relevant here).

Helicon Partners, LLC v. Kim's Provision Co., No. ADV 12-01602 SMB, 2013 WL 1881744, at *7 (Bankr. S.D.N.Y. May 6, 2013) is precisely on point.  After noting that a creditor generally may only attach property in which the debtor has an interest, the court explained that a different rule applies where property has been fraudulently transferred:  "[it] is well settled under New York law dating back more than 100 years that a plaintiff may attach fraudulently transferred property." Helicon Partners, LLC v. Kim's Provision Co., No. ADV 12-01602 SMB, 2013 WL 1881744, at *7 (Bankr. S.D.N.Y. May 6, 2013) (citing Hess v. Hess, 22 N.E. 956, 956 (N.Y.1889); Rinchey v. Stryker, 28 N.Y. 45, 54 (N.Y.1863); Mandl v. Mandl, 61 N.Y.S.2d 364, 367 (Sup.Ct. NY Cty. 1946)). As the New York Court of Appeals held in a seminal case, "[g]oods and chattels fraudulently assigned by a debtor to hinder, delay, and defraud creditors are attachable in the hands of his voluntary assignee at the suit of a creditor defrauded by the assignment." Hess v. Hess, 22 N.E. at 956. Accord, Farlee v. Farlee, 134 Misc. 275, 278, 235 N.Y.S. 239, 241 (Sup. Ct. Monroe Cty. 1929) ("[Defendant] contends that, having assigned his share in this estate, there was nothing to attach, but he forgets that a creditor is not bound by an

assignment, but may... in connection with an action to recover his claim…attach the property assigned on the ground that the assignment was fraudulent."); <u>Schnarch v. Shapiro</u>, 177 Misc. 410, 410, 30 N.Y.S.2d 537 (Sup. Ct. Kings Cty. 1941) ("The language used in section 278 of the Debtor and Creditor Law would seem to indicate that all property fraudulently conveyed… is attachable.").

   2. <u>Is it necessary that the Trusts be joined as defendants in this proceeding before the property transferred to the Trusts can be attached?</u>

   <u>Helicon</u> addresses this point as well, stating:

> [T]he case law recognizes the plaintiff's right to levy on property held by a non-party garnishee pursuant to an order of attachment. *E.g., Allstate Ins.,* 2000 WL 34011895, at * 16; *Gala Enters., Inc. v. Hewlett Packard Co.,* 970 F.Supp. 212, 217 (S.D.N.Y.1997); *K/S Norman Agathe v. Sea Trade & Constr. Ltd.,* 767 F.Supp. 60, 61–62 (S.D.N.Y.1991); *Am. Jerex Co.,* 340 F.Supp. at 532; *Great Lakes Carbon Corp.,* 387 N.Y.S.2d at 115; *Mandl,* 61 N.Y.S.2d at 367; *Exchange Nat. Bank of Tulsa v. Washington,* 30 N.Y.S.2d 43, 44–45 (N.Y.Sup.Ct.1941). Furthermore, CPLR § 6214(d) recognizes that the plaintiff may attach the property or a debt in the possession of a nonparty, and makes no exception for fraudulently transferred property or property held in the name of an alter ego.

<u>Helicon Partners, LLC v. Kim's Provision Co.</u>, No. ADV 12-01602 SMB, 2013 WL 1881744, at *8 (Bankr. S.D.N.Y. May 6, 2013). Freidman's attempts to distinguish these cases are unavailing. (Mem. of Law in Opp'n to Mot., p. 19-24, ECF 17.) For example, framing the issue with regard to the attachment of the property held by the Trusts as one of due process, Defendants argue, "*Exch. Nat. Bank of Tulsa* and *Am. Jerex Co.*, cited by the bankruptcy court in *Helicon*, both demonstrate that non-parties—such as the Trusts here—must be a party to the action in which their property has been attached." (Mem. of Law in Opp'n to Mot., p. 20, ECF 17.) However, Defendants' discussion shows that these cases support the opposite conclusion:

>In *Exch. Nat. Bank of Tulsa*, a non-party claiming property seized under a warrant of attachment as property of the defendant to the underlying action moved for an order directing the sheriff to release the property unless the plaintiff provided the sheriff indemnity against the third person's claim. 30 N.Y.S.2d at 43-44. The court found that there was reason to believe that the non-party was entitled to the property and required the non-party to subject itself to the jurisdiction of the court in order to establish its ownership of the attached property at a hearing.    *Id.* at 45. Similarly, in *Am. Jerex Co.*, the plaintiff secured an order of attachment on defendant's accounts receivable.    *Am. Jerex Co.*, 340 F. Supp. at 526-27.    A non-party bank petitioned to intervene in the action for the purpose of vacating the attachment order, claiming that it was the assignee of the accounts receivable and that its interest would be impaired unless permitted to intervene. *Id.* at 527. The district court granted the non-party's motion to intervene in order to allow it to protect its interests and demonstrate it was the proper owned [sic] of the attached property. *Id.* at 532. Thus, in both *Exch. Nat. Bank of Tulsa* and *Am. Jerex Co.* the non-party garnishee was a required to appear in the action and was therefore subject to the Court's jurisdiction.

(Mem. of Law in Opp'n to Mot., p.20-21, ECF 17.) (Emphasis added). These cases do not stand for the proposition that property may not be attached in the hands of a non-party, but rather that a non-party claiming an interest in property that has been attached is entitled to seek relief from the order of attachment. This remedy is explicitly provided in CPLR 6223: "[p]rior to the application of property or debt to the satisfaction of a judgment, the defendant, the garnishee or any person having an interest in the property or debt may move, on notice to each party and the sheriff, for an order vacating or modifying the order of attachment." CPLR 6223(a). Furthermore, were the Trusts to bring such a motion, the burden to demonstrate the entitlement to an order of attachment would remain on the Plaintiff. CPLR 6223(b).

### 3. Is Citibank required to identify the assets it seeks to attach?

Freidman argues that an order of attachment must state with specificity what property is to be attached. However, CPLR 6211(a), which prescribes the contents of an order of attachment, contains no such requirement:

> [An order of attachment] shall specify the amount to be secured by the order of attachment including any interest, costs and sheriff's fees and expenses, be indorsed with the name and address of the plaintiff's attorney and shall be directed to the sheriff of any county or of the city of New York where any property in which the defendant has an interest is located or where a garnishee may be served. The order shall direct the sheriff to levy within his jurisdiction, at any time before final judgment, upon such property in which the defendant has an interest and upon such debts owing to the defendant as will satisfy the amount specified in the order of attachment.

Therefore, "It is not necessary for the order of attachment to describe the property to be attached." 12 Weinstein, Korn & Miller, New York Civil Practice ¶ 6211.05 (2015). This rule is of long standing:

> "[F]or many generations sheriffs and those to whom they deliver copies of the warrants have been managing to decide, without further elaboration in the warrant, what property is subject to attachment; and I think it would introduce a cumbersome and troublesome practice to undertake to embody in the warrant itself specific directions as to what property is subject to it."

Rehill v. Rehill, 202 Misc. 865, 867, 118 N.Y.S.2d 251, 253, (Sup. Ct. N.Y. Cty. 1952).

Furthermore, "[i]f the order does specify certain property, the sheriff is not prohibited from levying upon any other property when it is necessary to do so to secure enough property to guarantee the availability of the amount set forth in the attachment order." 12 Weinstein, Korn & Miller, New York Civil Practice ¶ 6211.05 (2015).

Accordingly, Plaintiff's motion is not deficient because it seeks to attach all of Freidman's property and all the property which he transferred to the Trusts.

### Conclusion

For all of the foregoing reasons, the stay, entered on November 19, 2015 (ECF 34), of the order of attachment entered on November 17, 2015 (ECF 28), is lifted, and Citibank is authorized to attach the Real Estate Entities transferred by Freidman to the Trusts. Citibank is directed to submit an order consistent with this decision.



**Dated: Brooklyn, New York**
**January 12, 2016**

_____
**Carla E. Craig**
**United States Bankruptcy Judge**