UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------x
In re                                                    Chapter 7

HYPNOTIC TAXI LLC, et al.,                               Case No. 15-43300 (CEC)

                            Debtors.

----------------------------------------------------------x

CITIBANK, N.A.,
                                                         Adv. Pro. No.: 15-01185 (CEC)
                            Plaintiff,

v.

BOMBSHELL TAXI LLC, et al.,

                            Defendants.

----------------------------------------------------------x

## PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

APPEARANCES:

Jantra Van Roy, Esq.                    Brett A. Berman, Esq.
Nathan Schwed, Esq.                     Jordan B. Kaplan, Esq.
Robert Guttmann, Esq.                   Fox Rothschild LLP
Zeichner Ellman & Krause LLP            101 Park Ave., 17th Floor
1211 Avenue of the Americas             New York, NY 10017
New York, NY 10036                      Attorneys for Defendant Evgeny Freidman
Attorneys for the Plaintiff

CARLA E. CRAIG
Chief United States Bankruptcy Judge

This matter comes before the Court on the motion of Citibank, N.A. ("Citibank") for partial summary judgment against Evgeny Freidman ("Freidman") to recover on guaranties of loans made to business entities controlled by Freidman, and dismissing Freidman's affirmative defenses and counterclaims. Freidman argues that Citibank caused the default on the underlying loans through its bad faith actions and, as a result, Citibank cannot be awarded summary judgment on the guaranties.   Because Freidman has not raised any genuine issue of material fact with respect to Citibank's entitlement to judgment on the guaranties, it is recommended that Citibank's motion for partial summary judgment on Freidman's guaranties be granted.   In addition, for reasons discussed below, Citibank's motion for summary judgment dismissing Freidman's counterclaims should also be granted.

JURISDICTION

This Court has jurisdiction of this proceeding pursuant to 28 U.S.C. § 1334(b), and the Eastern District of New York standing order of reference dated August 28, 1986, as amended by order dated December 5, 2012.   This non-core proceeding is related to these bankruptcy cases. Publicker Indus. Inc. v. United States (In re Cuyahoga Equip. Corp.), 980 F.2d 110, 114 (2d Cir. 1992).   A bankruptcy judge may hear a non-core proceeding that is related to a bankruptcy case. 28 U.S.C. § 157(c)(1).   Absent consent of the parties to entry of a final order, the bankruptcy judge is directed to submit proposed findings of fact and conclusions of law to the district court, and any final order or judgment shall be entered by the district judge after considering the bankruptcy judge's proposed findings of fact and conclusions and after reviewing de novo those matters to which any party has timely and specifically objected. Id. As the parties have not consented to the entry of a final order by the bankruptcy court, this motion is addressed by these proposed findings and conclusions.

<u>BACKGROUND</u>

The facts set forth below are not in dispute except where otherwise noted.

Freidman was the sole managing member or the sole shareholder of the following limited liability companies and corporations: Hypnotic Taxi LLC, Vodka Taxi LLC, Pudding Taxi Inc., Chopard Taxi Inc., Iceberg Taxi Inc., Milkyway Cab Corp., Vsop Taxi Inc., Cupcake Taxi LLC, Dorit Transit Inc., Hennessey Taxi Inc., Candy Apple Taxi LLC, Stoli Taxi Inc., Pointer Taxi LLC, Palermo Taxi Inc., Marseille Taxi LLC, Bombshell Taxi LLC, Merlot Taxi LLC, France Taxi LLC, Bourbon Taxi LLC, Chianti Taxi LLC, Pinot Noir Taxi LLC, and Butterfly Taxi LLC (collectively, the "Debtors").   (Freidman LBR 1007-4 Aff. ¶ 1, Case No. 15-43300-CEC, ECF No. 2.)[1] Each of these entities owns either two or three taxi medallions issued by the New York City Taxi and Limousine Commission, permitting the performance of taxi services.   (Freidman LBR 1007-4 Aff. ¶ 5, Case No. 15-43300-CEC, ECF No. 2.)   The Debtors also own the vehicles used to provide the taxi services.   (Freidman LBR 1007-4 Aff. ¶ 5, Case No. 15-43300-CEC, ECF No. 2.)[2]

The Debtors' taxi vehicles and medallions were leased by, and operated through, four management companies, which are owned by Freidman: 28th Street Management, Inc., Downtown Taxi Management, LLC, Woodside Management, Inc., and Tunnel Taxi Management, LLC (collectively, the "Management Companies").   (Freidman LBR 1007-4 Aff. ¶ 7, Case No. 15-43300-CEC, ECF No. 2.)   The Management Companies' base lease obligation to each of the Debtors was equal to the debt service to Citibank (as discussed below).

---

[1] Citations to "ECF No." are to documents filed in Adv. Pro. No. 15-01185-CEC, identified by docket entry number.   Citations to "Case No. 15-43300-CEC, ECF No. []" are to documents filed in the main bankruptcy case, <u>In re Hypnotic Taxi LLC</u>, identified by docket entry number.

[2] There is currently a dispute between the chapter 7 trustee of the Debtors' estates and the Management Companies (defined below) regarding ownership of four of the vehicles listed on the Debtors' schedules of assets, but resolution of that issue is not relevant to the disposition of this motion.   <u>See</u> Compl., Adv. Pro. No. 07-1017-CEC.

(Freidman LBR 1007-4 Aff. ¶ 7, Case No. 15-43300-CEC, ECF No. 2.)   Under the arrangement between the Debtors and the Management Companies, the Management Companies received the gross revenue from the operation of the taxis, and paid all associated expenses, including debt service, insurance coverage, and vehicle maintenance and repair.   (Freidman LBR 1007-4 Aff. ¶ 7, Case No. 15-43300-CEC, ECF No. 2.)   None of the Debtors maintained pre-petition bank accounts.   (Freidman LBR 1007-4 Aff. ¶ 8, Case No. 15-43300-CEC, ECF No. 2.)

Between December 2012 and July 2013, Citibank and the Debtors entered into three loan transactions: a $21 million loan by Citibank to fourteen of the Debtors (the "$21 Million Borrowers"), evidenced by notes dated December 20, 2012; a $10 million loan by Citibank to eight Debtors (the "$10 Million Borrowers"), evidenced by notes dated February 1, 2013; and a $1.5 million line of credit by Citibank to Taxi Club Management Inc., another corporation owned by Freidman, evidenced by a note dated July 1, 2013, (respectively, the "$21 Million Loan," the "$10 Million Loan," and the "$1.5 Million Loan," and collectively, the "Loans")[3]. (Citibank Rule 19-A Stmt. ¶¶ 7, 14, 21, ECF No. 92-1; Walsh Aff., ¶¶ 7-10, 15-16, 18, 26 and Exs. C, H, K, ECF Nos. 92-5, 92-8, 92-9, 92-18, 92-19, 92-30.) The Loans are secured by the taxi medallions owned by the respective Debtors, and each of the Loans is guaranteed by Freidman. (Citibank Rule 19-A Stmt. ¶¶ 8, 9, 15, 20, 24, 25, ECF No. 92-1; Walsh Aff. ¶¶ 11, 12, 19, 24, 29 and Exs. D, E, I, J, M, N, ECF Nos. 92-5, 92-10, 92-11, 92-12, 92-13, 92-14, 92-15, 92-16, 92-20, 92-21, 92-22, 92-23, 92-24, 92-25 92-26, 92-27. 92-28, 92-29, 92-32, 92-33.)

[3] The $10 Million Borrowers are Bourbon Taxi LLC, Butterfly Taxi LLC, Chianti Taxi LLC, France Taxi LLC, Hypnotic Taxi LLC, Merlot Taxi LLC, Pinot Noir Taxi LLC, and Vodka Taxi LLC. (Citibank Rule 19-A Stmt. ¶¶ 4, 7, ECF No. 92-1.) The $21 Million Borrowers are Bombshell Taxi LLC, Candy Apple Taxi LLC, Chopard Taxi Inc., Cupcake Taxi LLC, Dorit Transit Inc., Hennessy Taxi Inc., Iceberg Taxi Inc., Marseille Taxi LLC, Milky Way Cab Corp., Palermo Taxi Inc., Pointer Taxi Inc., Pudding Taxi LLC, Stoli Taxi Inc., and Vsop Taxi Inc. (Citibank Rule 19-A Stmt. ¶¶ 11, 14, ECF No. 92-1.) The $21 Million Loan Borrowers, the $10 Million Loan Borrowers, Taxi Club Management are collectively referred to herein as the "Borrowers."

The $1.5 Million Loan to Taxi Club Management, Inc. was also guaranteed by the Debtors. (Citibank Rule 19-A Stmt. ¶ 26, ECF No. 92-1; Walsh Aff. ¶ 31 and Ex. O, ECF Nos. 92-5, 92-34.)

Also around that time, in January 2013, Citibank and certain entities owned and controlled by Freidman (the "Account Holders"), including the Management Companies, entered into a banking arrangement, memorialized by an application, a Master Cash Management Service Agreement, a Supplement to Master Cash Management Service Agreement, and other policies referenced therein.   (Walsh Reply Decl. ¶¶ 4, 5 and Ex. D, ECF Nos. 90, 90-5, 90-6.) The parties initially agreed that, given the nature and complexity of the taxi businesses, including the frequency of fraudulent checks being presented in that industry, the Account Holders would have a controlled disbursement account, or "zero balance account," linked to a funding account from which the funds to honor checks and debits presented against the controlled disbursement account would be transferred.   (Walsh Reply Decl. ¶ 5, ECF No. 90; Dumitru Aff. ¶¶ 6, 7, ECF No. 343-3; Freidman Aff. ¶¶ 23, 27, 28, ECF No. 343-11.)   Under this arrangement, Citibank agreed to provide the Account Holders with a list of all checks and other debits presented by payees each business day prior to when Citibank would pay them, and the Account Holders would inform Citibank which ones should be honored and which were fraudulent. (Dumitru Aff. ¶ 8, ECF No. 343-3.)

The Supplement to Master Cash Management Service Agreement, which sets forth the zero balance account arrangement, provides, in part:

> Bank will provide Client with notification through Citibusiness®Online of the total dollar amount of all debit entries or checks to be posted to the account owner's designated demand deposit account ("Account") on each Bank business day. By the earlier of the close of Bank's business that day or 3 p.m. Eastern Time, Client must provide adequate funds immediately available for

> withdrawal ("Account Balance") to cover all debit entries presented for payment against the Account.   Client acknowledges that in the event there is not a sufficient Account Balance, Bank may return items presented for payment for either non-sufficient funds or uncollected funds . . . .

(Supplement to Master Cash Management Service Agreement ¶ 1, ECF No. 90-5.) Freidman asserts that, in practice, the Account Holders were given until noon the day following the date of presentment to deposit sufficient funds to cover the approved debits.   (Dumitru Aff. ¶ 8, ECF No. 343-3; Mem. of Law in Opp'n at 4, ECF No. 343.)

By letter dated May 8, 2014, Citibank notified Freidman that the Cash Management Service Agreement would be terminated effective May 23, 2014.   (Freidman Aff. Ex. C (Micheletti Letter dated May 8, 2014), ECF No. 343-11.)   After the effective date, the Account Holders no longer had the contractual right to review or approve the checks presented in advance of payment, or to fund the accounts after checks were presented. (Dumitru Aff. ¶ 10, ECF No. 343-3).   Rather, sufficient funds were required to be on deposit in the accounts at the time of presentment.   (Dumitru Aff. ¶ 10, ECF No. 343-3).   According to Freidman, this change in the banking arrangement resulted in monthly bank fees of $50,000-$100,000, the loss of hundreds of taxi drivers whose paychecks bounced, and ultimately, to a negative cash flow for the businesses. (Dumitru Aff. ¶¶ 11, 12, ECF No. 343-3.)

Each of the Loans had a payment due on December 1, 2014, which was not made, and on December 4, 2014, Citibank declared a default and accelerated the Loans pursuant to the Loan provisions.   (Citibank Rule 19-A Stmt. ¶¶ 31-32, 34-37, ECF No. 92-1; Walsh Aff. ¶¶ 36-37, 40-42, ECF No. 92-5.)[4]   On December 5, 2014, partial payments were made, but were rejected

---

[4] Although Freidman denies that the Borrowers defaulted under the Loans, it appears that Freidman does not dispute the non-payment of the Loans, but denies liability under the Loans and guaranties based upon Citibank's actions. (Defendants' Response to Plaintiff's Rule 19-a Stmt. ¶¶ 31-49, ECF No. 94-11.)

for insufficient funds on the accounts.   (Walsh Aff. ¶ 52, ECF No. 92-5; Walsh Reply Decl. ¶ 2, ECF No. 90.) The payments subsequently cleared, and were credited to the respective Loans. (Walsh Aff. ¶ 52, ECF No. 92-5; Walsh Reply Decl. ¶ 2, ECF No. 90.)

On December 31, 2014, the $1.5 Million Loan matured. (Citibank Rule 19-A Stmt. ¶ 33, ECF No. 92-1; Walsh Aff. ¶¶ 27, 38, and Ex. L, ECF 92-5, 92-31.)   Failure to pay the $1.5 Million Loan triggered another default with respect to the $21 Million Loan, and Citibank gave notice of these defaults to all of the Borrowers, as well as to Freidman in his capacity as guarantor.   (Citibank Rule 19-A Stmt. ¶¶ 43, 44, ECF No. 92-1; Walsh Aff. ¶¶ 20-22, 36-37, 48, ECF Nos. 92-5.) The $10 Million Loan matured on January 31, 2015, and the failure to pay at that time constituted an additional default with respect to the $10 Million Loan. (Citibank Rule 19-A Stmt. ¶¶ 39, 40, ECF No. 92-1; Walsh Aff. ¶ 44, 45, ECF No. 92-5.)

On March 5, 2015, Citibank commenced an action in New York State Supreme Court, New York County, asserting twelve causes of action against Freidman and the other defendants. Freidman filed an answer asserting twenty four affirmative defenses and twelve counterclaims. On June 22, 2015, Citibank filed this motion seeking, among other things, partial summary judgment against Freidman to recover under the guaranties of the Loans.

On July 22, 2015, the Debtors filed voluntary chapter 11 bankruptcy petitions.[5]   The commencement of the bankruptcy cases automatically stayed Citibank's action against the Debtors.

On July 29, 2015, the Debtors removed the state court action to the United States District Court for the Southern District of New York, and after transfer to the United States District

---

[5]   These cases were consolidated for procedural purposes and are jointly administered as <u>In re Hypnotic Taxi</u>, Case No. 15-43300.

Court for the Eastern District of New York, because of the pending bankruptcy cases, the action was referred to this Court by order dated October 28, 2015. (Notice of Removal, ECF No. 1.)

On September 22, 2016, upon the motions of the United States Trustee and Citibank, and in absence of opposition by the Debtors or any parties in interest, the Debtors' chapter 11 bankruptcy cases were converted to cases under chapter 7 of the Bankruptcy Code.   (Case No. 15-43300-CEC, ECF No. 368.)

Freidman argues that Citibank is precluded from recovering under the guaranties because it caused the Borrowers' defaults under the Loans by violating the implied covenant of good faith in the banking relationship. Specifically, Freidman argues that Citibank unilaterally modified the banking arrangement between the Citibank and the Account Holders, bounced checks notwithstanding sufficient funds in the accounts, placed holds on accounts to prevent deposits from being credited or funds from being transferred out, and issued notices to payees that a check may not be honored due to insufficient funds even though the accounts were fully funded prior to the expiration of the noon deadline to fund the accounts.   (Mem. of Law in Opp'n at 5-6, 9, ECF No. 343.)   Freidman asserted that the evidence to support these allegations was within the control of Citibank, and therefore, at a hearing on March 9, 2016, and pursuant to Rule 56(d) of the Federal Rules of Civil Procedure (incorporated in Rule 7056 of the Federal Rules of Bankruptcy Procedure), the Court directed Citibank to produce to Freidman all account statements for all accounts maintained by the Account Holders with Citibank.   (Tr. 3/9/16 at 27, 78-79, ECF No. 111.)[6]

Thereafter, on August 3, 2016, Freidman filed a motion seeking further discovery, including emails relating to the banking relationship (ECF No. 246), and, after a hearing, the

---

[6] "Tr." refers to the transcript of the hearing held on the date specified.

Court issued an order on October 5, 2016, directing Citibank to produce all documentation

governing the parties' banking relationship, and all communications throughout the entire period

of the banking relationship between any Citibank employee and Freidman, or any of his

employees or attorneys (ECF No. 300).   Citibank also produced a list of all of the items returned

on the Account Holders' accounts between May 16, 2014 and December 16, 2014, and

specifying the reasons for return.[7]   (Frattasi Decl. Ex D, ECF Nos. 271-7, 271-8.)   Of the 3,150

items returned during that period, 158 were for uncollected funds, i.e., funds that were deposited

but were not yet available.   (Frattasi Decl. n.2, ¶¶ 7-8, Ex. E, ECF Nos. 271, 271-9.)   Citibank

also produced copies of all deposits made to the Account Holders' accounts on days when items

were returned for uncollected funds.   (Frattasi Decl. Ex. F, ECF Nos. 271-10, 271-11, 271-12.)

After that additional discovery was provided, the parties filed supplemental affidavits and legal

memoranda.

## STANDARD FOR SUMMARY JUDGMENT

Summary judgment is appropriate when "the pleadings, the discovery and disclosure

materials on file, and any affidavits show that there is no genuine issue as to any material fact

and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In ruling

upon a summary judgment motion, the court's job is not to resolve disputed issues of fact, but to

determine whether a genuine issue of fact exists. See Celotex Corp. v. Catrett, 477 U.S. 317, 330

(1986). "When viewing the evidence, the court must 'assess the record in the light most

favorable to the non-movant and . . . draw all reasonable inferences in [the non-movant's]

favor.'" Weinstock v. Columbia Univ., 224 F.3d 33, 41 (2d Cir. 2000) (citing Del. & Hudson Ry.

Co. v. Consol. Rail Corp., 902 F.2d 174, 177 (2d Cir. 1990)), cert. denied, 540 U.S. 811 (2003).

---

[7] The Frattasi Declaration states that the relevant period is May 15, 2016 through December 16, 2016, but that is clearly a typographical error.   (Frattasi Decl. ¶ 7, ECF No. 271.)

"The nonmoving party must show that there is more than a metaphysical doubt regarding a material fact and may not rely solely on self-serving conclusory statements." Rosenman & Colin LLP v. Jarrell (In re Jarrell), 251 B.R. 448, 450–51 (Bankr. S.D.N.Y. 2000) (citations omitted).

"'[W]here, as here, a creditor seeks summary judgment upon a written guaranty, the creditor need prove no more than an absolute and unconditional guaranty, the underlying debt, and the guarantor's failure to perform under the guarantee." HSH Nordbank AG N.Y. Branch v. Street, 421 F. App'x 70, 72 (2d Cir. 2011) (quoting Kensington House Co. v. Oram, 293 A.D.2d 304, 739 N.Y.S.2d 572, 572 (App. Div. 1st Dep't 2002)).   Additionally, "'[a]bsolute and unconditional guaranties ... [can] preclude guarantors from asserting a broad range of defenses under New York law.'" Street, 421 F. App'x at 73 (quoting Compagnie Financiere de CIC et de L'Union Europeenne v. Merrill Lynch, Pierce, Fenner & Smith Inc., 188 F.3d 31, 35 (2d Cir. 1999)). In this case, Freidman's guaranties contained a waiver of all defenses (see e.g., Walsh Aff. Exs. E, J, N, ECF Nos. 92-14, 92-15, 92-27, 92-28, 92-29, and 92-33.)[8]

However, the Second Circuit has held that defense of bad faith in the performance of a contract is not waived by an absolute guaranty.   Bank of China v. Chan, 937 F.2d 780, 789 (2d Cir. 1991).   This is because there is "an implied covenant of good faith in the performance or enforcement of all contracts," which "'emphasizes faithfulness to an agreed common purpose and consistency with the justified expectations of the other party.'" Id. (quoting Restatement (Second) of Contracts § 205 cmts. a, d.)   Bad faith, on the other hand, includes "evasion of the

---

[8] Paragraph 3 of each of the guaranties provides in pertinent part: "The undersigned hereby waives all suretyship defenses, any rights to interpose any defense, counterclaim or offset of any nature and description which the undersigned may have or which may exist between and among Lender, Borrower and/or the undersigned with respect to the undersigned's obligations under this Guaranty, or which the Borrower may assert on the underlying debt, including but not limited to failure of considerations, breach of warranty, fraud, payment (other than cash payment in full of the Obligations), statute of frauds, bankruptcy, infancy, statute of limitations, accord and satisfaction, and usury."   (Guaranty ¶ 3, Walsh Aff. Exs. E, J, N, ECF Nos. 92-14, 92-15, 92-27, 92-28, 92-29, and 92-33.)

spirit of the bargain, lack of diligence and slacking off, willful rendering of imperfect performance, abuse of a power to specify terms, and interference with or failure to cooperate in the other party's performance." Id. (quoting Restatement (Second) of Contracts § 205 cmts. a, d.) Bad faith may also be evident where a party "acts so directly to impair the value of the contract for another party that it may be assumed that they are inconsistent with the intent of the parties." Bank of China, 937 F.2d at 789. Such actions "must directly violate an obligation that falls within their reasonable expectations." Id. A party's enforcement of its rights under the explicit terms of a contract, which may result in a negative affect on the other party, does not constitute bad faith to provide a defense to liability. HSH Nordbank AG N.Y. v. Swerdlow, 672 F. Supp. 2d 409, 419 (S.D.N.Y. 2000), aff'd sub nom, 421 F. App'x 70, 72 (2d Cir. 2011).

In this case, notwithstanding the voluminous papers filed on this motion, Freidman has not raised a genuine issue of material fact as to Citibank's entitlement to a judgment on Freidman's guaranties of the Loans.

DISCUSSION

Each of Freidman's arguments in support of his claim that Citibank's bad faith actions in connection with the Account Holders' accounts caused the Borrowers' defaults on the Loans will be examined in turn, together with the evidence proffered by the parties which is relevant to that claim. In evaluating the evidence to determine whether Freidman has raised a genuine issue of material fact, the factual record will be assessed (as it must be) in the light most favorable to Friedman, and all reasonable inferences will be drawn in his favor. However, conclusory statements, unsupported by evidence, contained in affidavits submitted on Friedman's behalf, are not sufficient to raise an issue of fact. Jarrell, 251 B.R. at 450–51.

A. <u>Modification of the Banking Arrangement</u>

Freidman argues that Citibank impermissibly and unilaterally modified the banking arrangement with the Account Holders by terminating the zero balance accounts in May 2014 and limiting the Account Holders to utilizing standard business accounts, thereby stripping the ability to determine which debits should be paid following presentment, and requiring the accounts to have an available balance sufficient to honor all debits at the time of presentment. (Mem. of Law in Opp'n at 4, ECF No. 343.)    Freidman argues that Citibank "knew or should have reasonably known that this change would cause material harm to [d]efendants' business." (Mem. of Law in Opp'n at 4, ECF No. 343.)    Freidman argues that Citibank modified the account to set Freidman's business up for failure because it wanted to exit the taxi medallion market "as app-based companies like Uber and Lyft entered into the transportation marketplace in New York City."    (Mem. of Law in Opp'n at 1, 8, ECF No. 343; <u>See also</u> Mem. of Law in Opp'n at 17, ECF No. 54-38 (alleging that Citibank "plan[ned] to exit the New York City medallion market and, instead, focus its efforts in the app-based transportation market").)

Citibank counters that the contracts governing the zero balance accounts permitted it to modify or cancel the banking arrangements. (Citibank Reply Mem. of Law at 12, n.6, ECF No. 91; Citibank Response ¶¶ 6, 29-30, ECF No. 346.) Citibank asserts that the bank accounts were consistently underfunded at the time debits were honored, resulting in Citibank's involuntary loans to the Account Holders, and, for that reason, the zero balance accounts were terminated. (Walsh Reply Decl. ¶ 16, ECF No. 90; Citibank Response ¶¶ 3, 6, ECF No. 346; Tr. 3/9/16 at 11, ECF No. 111.)    In any event, Citibank points out, the agreement governing the zero balance accounts permitted either party to terminate on ten days' written notice, which Citibank provided.

"Under New York law, which the parties agree governs their contract dispute, the question of whether a written contract is ambiguous is a question of law for the court." JA Apparel Corp. v. Abboud, 568 F.3d 390, 396 (2d Cir. 2009). "'Ambiguity is determined by looking within the four corners of the document, not to outside sources....'" JA Apparel Corp. v. Abboud, 568 F.3d 390, 396 (2d Cir. 2009) (quoting Kass v. Kass, 91 N.Y.2d 554, 566, 673 N.Y.S.2d 350, 356, 696 N.E.2d 174 (1998)). See also Street, 421 F. App'x at 72 ("Summary judgment is appropriate on a contract claim under New York law where 'the intent of the parties can be determined from the face of the agreement." (quoting Katel Ltd. Liab. Co. v. AT&T Corp., 607 F.3d 60, 64 (2d Cir. 2010)).   Therefore, analysis must begin with the express terms of the contract to determine whether Citibank impermissibly modified the parties' banking arrangement.

The Master Cash Management Service Agreement provides, in pertinent part:

> Termination: This Agreement will continue in full force and effect until terminated.   This Agreement, any Services or Licenses, if any, provided hereunder, may be terminated at any time by either party upon at least ten (10) days prior written notice to the other party. Bank may terminate this Agreement immediately or refuse to perform any Service upon written notice (including telecopy) to Client in the event of (i) Client's breach of a material obligation under this Agreement or applicable law (including nonpayment of any Fees or other obligations under this Agreement). . .

(Master Cash Management Service Agreement ¶ 13, ECF Nos. 90-5; 343-11.)

It further provides:

> This Agreement constitutes the final and complete agreement between Bank and Client with respect to the Services and . . . supersedes all other oral or written agreements, understandings and representations.  Bank may amend this Agreement upon written notice to Client.  Any such amendment will be effective no earlier than 10 days after such notice is sent to Client in the manner described herein.

(Master Cash Management Service Agreement ¶ 15(i), ECF Nos. 90-5; 343-11.)

Freidman's argument that Citibank had no right to terminate the zero balance accounts is directly at odds with the provisions of the Master Cash Management Service Agreement, and therefore does not raise a genuine issue of mal fact with respect to his liability under the guaranties.   Additionally, notwithstanding the termination of the zero balance accounts on May 23, 2014, it appears that Citibank continued to accommodate the Account Holders by providing them with extensions to fund the accounts the day after presentment.   For example, in an email exchange dated October 8, 2014 between Elena Nicolescu, a Freidman employee, and Mayra Franceschini, a senior relationship service specialist at Citibank, the Account Holders requested, and were granted, an extension until 11:30 a.m. on the date following presentment to fund the accounts.   (Berman Decl. Ex. F, ECF No. 343-7.)

Nor has Freidman raised a genuine issue of material fact as to Citibank's entitlement to summary judgment based upon the ultimate termination of the Account Holders' remaining accounts in December 2014, because that was also within Citibank's rights under the agreement. Citibank informed the Account Holders in May 2014 that, upon termination of the zero balance accounts, the remaining operating accounts would be governed by the CitiBusiness Client Manual.   (Franceschini Decl., Ex. H at 6, ECF No. 347-8.)   The CitiBusiness Client Manual provides, in pertinent part:

> We reserve the right to close your account at any time with or
> without cause.   We may try to notify you in advance should this be
> necessary, but we are not obligated to do so. We also reserve the
> right to close any CitiBusiness account if a zero balance remains
> over 45 days.

(CitiBusiness Client Manual at 8, ECF No. 271-6.)

By letter dated November 6, 2014, Citibank's counsel notified Freidman that all of the accounts would be closed effective December 15, 2014. (Freidman Aff. ¶ 47, Ex. D, ECF No. 343-11.)   Citibank's termination of the accounts on five weeks' notice was well within its contractual rights, because, under the contract, Citibank was not required to provide any notice to the Account Holders. (CitiBusiness Client Manual at 8, ECF No. 271-6.)   Even if the Master Cash Management Service Agreement had been in effect at that time, that agreement only required ten days' notice prior to cancellation. (Master Cash Management Service Agreement ¶ 13, ECF No. 90-5, 343-11.)

Freidman argues that such termination provided "only five weeks to find a new banking institution, leading to chaos within [d]efendants' business operations." (Memo. of Law in Opp'n at 7, ECF No. 343.)   He also argues that Citibank's termination was motivated by its desire to "exit the New York City taxi medallion market for perceived greener pastures, [and] ensure that Mr. Freidman and his affiliated entities would not be a threat to its newfound venture." (Mem. of Law in Opp'n at 2, ECF No. 343.)   Freidman argues that summary judgment should be denied because additional discovery is required to establish Citibank's motivation behind the termination of the accounts, and declaring the defaults under the Loans.   However, denial of summary judgment to permit such discovery is unwarranted because a party's motivation for exercising a contractual right is "legally irrelevant." Metro Funding Corp. v. WestLB AG, No. 10 Civ. 1382 (CM), 2010 WL 1050315 (S.D.N.Y. Mar. 19, 2010).   See also HSH Nordbank AG

14

NY Branch v. Swerdlow, 672 F. Supp. 2d 409, 419 (S.D.N.Y. 2009) ("'[E]xercising contract rights to protect an investment does not constitute bad faith.'" (quoting Roswell Capital Partners LLC v. Alt. Constr. Techs., 638 F. Supp. 2d 360, 371 (S.D.N.Y.2009))).   Therefore, any allegation relating to Citibank's motivation does not raise a genuine issue of material fact in this case.

B.  Dishonored Checks

Freidman alleges that Citibank exercised bad faith and caused the Borrowers' defaults under the Loans by failing to honor checks drawn on the Account Holders' bank accounts notwithstanding sufficient funds on deposit.   In support of his argument, Freidman cites to emails in which Franceschini acknowledges that certain checks were improperly bounced.   On August 26, 2014, in response to an inquiry why three checks were returned, Franceschini responded apologizing for the error.   (Berman Decl. Ex. G, ECF No. 343-8). Citibank now contends that, in fact, the checks were properly rejected, because there were insufficient funds in the accounts, but that Citibank sent the apology letter as an accommodation to Freidman. (Citibank Response at ¶ 13, ECF No. 346.)

Freidman argues that Citibank made other errors in handling the accounts, citing an email sent by Christopher Micheletti, a Senior Vice President of Citibank, on November 8, 2013, acknowledging that Citibank had failed to stop payment on certain checks designated as fraudulent. (Friedman Aff. Ex B (email exchange dated Nov. 8, 2013), ECF No. 343-11.) Freidman also cites an email dated November 17, 2014, in which Freidman asserted that Citibank mistakenly refused to honor a transfer when sufficient funds were on deposit in that account.   (Friedman Aff. Ex B, ECF No. 343-11.)

However, even when all reasonable inferences are drawn in Freidman's favor, the instances of mishandling of debits or credits cited by Freidman cannot raise a genuine issue of material fact to support Freidman's argument that Citibank acted in bad faith and caused the Borrowers' default.   It is undisputed that large quantities of checks were processed each business day and that "hundreds of millions of dollars [were] coming in and out of bank accounts affiliated with . . .   Freidman on a yearly basis." (Dumitru Aff. ¶6, ECF No. 343-3.) Identification of a handful of errors throughout the course of the parties' banking relationship does not constitute evidence of bad faith mismanagement of the accounts.   It should be noted that consideration of this summary judgement motion was deferred for approximately nine months so that Freidman could obtain and analyze all of the account statements and all of the communications between Freidman and his employees or agents and Citibank.   Freidman also obtained from Citibank a list of all checks dishonored after the closing of the zero balance accounts, as well as copies of all deposits made to the accounts on days when checks were dishonored for insufficient funds.   Despite Freidman's claims that further discovery is needed, it is clear that documentation has been provided that would enable him to point out additional instances where checks were wrongfully dishonored or stop-pay instructions were not followed. In these circumstances, it is not reasonable to infer, as Freidman urges, that the errors he cites (assuming that they are all errors which Citibank does not concede) are evidence of a pattern of wrongdoing by Citibank.   See Weinstock, 224 F.3d at 41 (directing that "all reasonable inferences" be drawn in the non-movant's favor).[9]

---

[9] In his affidavit dated April 27, 2015, attached as Exhibit J to his counsel's declaration submitted in opposition to this motion, Freidman also alleges that Citibank also mishandled the accounts by providing an incorrect funding amount for the zero balance accounts; double posting checks on cash management accounts; debiting disbursement accounts twice in error; and providing account statements that were missing transactions.   (Freidman Aff. at 6-7, ECF No. 343-11.)   No substantiation is provided for these claims, although Freidman has been provided with all the account statements and communications between the parties, which would reflect these errors.   Under these circumstances, these unsupported allegations do not raise a genuine issue of material fact.

Freidman also alleges that, "defying logic," Citibank bounced all checks presented when the account was partially funded, rather than honoring checks for which funding was sufficient. (Mem. of Law in Opp'n at 5, ECF No. 343.)   However, review of the email exchange cited by Freidman in support of this assertion reveals that this occurred after the termination of the Master Cash Management Service Agreement in May 2014, when the accounts were insufficiently funded on the day of presentment. (See Berman Decl. Ex. E, email from Freidman dated Oct. 8, 2014, ECF No. 343-6; Berman Decl. Ex. F, email from Freidman dated Oct. 8, 2014, ECF No. 343-7.)   Citibank had no obligation to honor checks that were not funded on the date of presentment, but agreed to extend the funding deadline if all overdraft items were covered.   By email dated September 30, 2014, Micheletti notified Freidman and Andreea Dumitru, the Account Holders' Chief Financial Officer, that overdrawn accounts would have to be fully funded by the extended deadline:

> Daily overdraft activity is unacceptable as we have discussed numerous times . . . .   It is a very labor intensive process to individually go into our systems and pay certain items and return others when an account is partially covered. We have done this from time to time in the past as an accommodation to you.   Due to the incessant overdraft activity in your accounts, our operations team has made the decision that only accounts that are fully covered will have all presented items paid.   Partially covered accounts will default to system processing, whereby all start of day overdraft items will be returned.
>
> Please understand that the overdraft accounts need to be remedied and positive balances be carried in all accounts.

(Berman Decl. Ex. C (email dated Sept. 30, 2014 9:55 AM), ECF No. 343-4.)   Given that the accounts were required to contain sufficient funds to cover all checks on the day of presentment, and that Citibank had no contractual obligation to permit next-day funding of overdrafts, it is

difficult to see how a reasonable inference could be drawn that Citibank acted wrongfully in conditioning the extension on full funding of the overdraft by the extended deadline.

The record presented on this motion shows that the Account Holders' accounts were frequently overdrawn from early on in the parties' banking relationship.   In an email dated May 1, 2013, in which Micheletti explains the calculation of overdraft charges, he notes that the accounts had 1,424 overdrawn items in February 2013, and 778 overdrawn items in March 2013. (Walsh Reply Decl. at Ex. E (email from Micheletti dated May 1, 2013 4:34 PM), ECF No. 90-7.)   In that email he agrees to waive overdraft fees for February 2013 "with the following understanding [that] . . . [c]ontrol disbursement accounts need to be covered same day by 5PM." (Id.)

Five days later, on May 6, 2013, Citibank warned Friedman's employee that "[w]e need to find a solution that avoids these daily overdraft situations."   (Walsh Reply Decl. at Ex. E (email from Dennis Nochowitz dated May 6, 2013 12:16 PM), ECF No. 90-7.) On that morning, the accounts were overdrawn by $637,797.04. (Walsh Reply Decl. Ex. E (email from Franceschini dated May 6, 2013 7:42 AM), ECF No. 90-7.)   And, in the afternoon of that day, Freidman's employee was informed that "the control disbursement today is north of $800,000," and was asked to "relate the plan to cover" those disbursement that day.   (Walsh Reply Decl. Ex. E (email from Dennis Nochowitz dated May 6, 2013 3:46 PM), ECF No. 90-7.)   In response, Freidman's employee assured that the accounts will be "fully covered overnight," and explained that those particular overdraft amounts were caused by the bi-annual renewal fees for the medallions. (Walsh Reply Decl. Ex. E (emails from Elizabeth Suazo Di Paola dated May 6, 2013 at 12:35 PM and 4:32 PM), ECF No. 90-7 at 10-11.)

The $1.5 Million Loan, which was a line of credit, was intended to address "cash flow problems" and the frequent overdraft status of the accounts.   (Walsh Reply Decl. ¶ 11 and Ex. F (email from Micheletti dated June 18, 2013 20:19:53), ECF Nos. 90, 90-8.)   An email from Micheletti to Freidman's employee dated June 18, 2013 set forth the terms of the $1.5 Million Loan, stating that the line of credit was being extended "[i]n an effort to alleviate the ongoing overdraft in the operating accounts," and to provide "[w]orking [c]apital to support immediate cash needs." (Walsh Reply Decl. Ex. F (email from Micheletti dated June 18, 2013 20:19:53), ECF No. 90-8.)   The following day, prior to the execution of $1.5 Million Loan on July 1, 2013, the accounts were overdrawn $431,555.20, and Citibank requested that the accounts be covered by 11:30 a.m.   (Walsh Reply Decl. Ex. E, ECF No. 90-7.)

A July 17, 2013 email from Micheletti to Freidman stated:

> I wanted to thank you for utilizing the line to cover the majority of accounts and significantly reduce the overdraft activity. I know [Freidman's employee] has been drawing on the line and repaying it on a daily, basis, which is exactly how the line should be utilized. . . .With the line now in place and the pre-notification feature of the control disbursement accounts overdraft activity needs to be eliminated completely.

(Walsh Reply Decl. Ex. G (email from Micheletti dated July 17, 2013 3:25 PM), ECF No. 90-9.)

However, the accounts eventually returned to overdrawn status.   On November 8, 2013, the Account Holders were notified that a funding account was overdrawn by $117,585.19, though it also appears that Citibank failed to stop payment on fraudulent checks totaling $99,520.73 on that date.   (Freidman Aff. Ex. B (email from Franceschini dated Nov. 8, 2013 8:26 AM; email from Anita Cisneros dated Nov. 8, 2013 10:08 AM, email from Anita Cisneros dated Nov. 7, 2013 9:43 AM), ECF No. 343-11).   Even assuming those checks should not have been honored, the funding account was still overdrawn by $18,064.46.   And, in an email

exchange dated Jan. 2, 2014, the Account Holder is informed that it is currently overdrawn $99,599.53, and is asked to cover the account by 11 a.m.   (Franceschini Decl. Ex. G (email from Franceschini dated Jan. 2, 2014 8:13 AM), ECF No. 347-7.)   The Account Holder is also warned that it must "get to the point where transfers do not need to be made the following day – they should be made the same day," and that the accounts may have to be closed otherwise. (Franceschini Decl. Ex. G (email from Micheletti dated Jan. 2, 2014 11:08 AM), ECF No. 347-7.)   In response, Freidman's employee states "I fully understand and agree.   We have had some issues of late with CC processing and seasonal lows (not your problem)[.]   We are making every effort to have the account funded the day of moving forward." (Franceschini Decl. Ex. G (email from James Johnson dated Jan. 2, 2014 12:44 PM), ECF No. 347-7.)

Similar email exchanges occurred on January 13, 2014, reflecting that another account was overdrawn $84,450.95 and had insufficient funds for five consecutive days. (Franceschini Decl. Ex. G (email from Franceschini dated Jan. 13, 2014 13:27:46), ECF No. 347-7.)   And, on January 24, 2014, the account was overdrawn again by $4,317.27, and $56,199.02 was needed to cover checks in other accounts. (Franceschini Decl. Ex. G (email from Franceschini dated Jan. 24, 2014 at 8:58 AM), ECF No. 347-7.)   Micheletti warned Freidman's employee:

> You committed to covering same day, yet this has not yet occurred. As discussed I am getting pressure to close the control disbursement accounts because of the continual overdraft activity in the funding account, and the operational issues it causes.   Please advise when you will begin covering the accounts same day when control disbursement items are presented as opposed to next day as is common practice now.

(Franceschini Decl. Ex. G. (email from Micheletti dated January 24, 2014 9:39 AM), ECF No. 347-7.)

Later, on February 27, 2014, the Account Holders were informed that one account was underfunded by $96,551.76 and another by $159,550.70.   (Franceschini Decl. Ex. G (email from Franceschini dated Feb, 27, 2014 2:21 PM), ECF No. 347-7.)   And, on March 14, 2014, Freidman was informed that four checks, totaling $601,900 were being returned for insufficient funds.   (Franceschini Decl. Ex. G (email from Micheletti dated Mar. 14, 2014 10:16 AM), ECF No. 347-7.)   Additionally, on May 14, 2014, Citibank notified Freidman's employee that an account was blocked because it was overdrawn for 6 consecutive days. (Franceschini Aff. Ex. G (email from Micheletti dated May 14, 2014 3:34 PM), ECF No. 347-7.)

Finally, on June 10, 2014, after the zero balance account arrangement was terminated, Citibank informed Freidman's employee:

> Please be advised that, as we have discussed and communicated on several occasions, we cannot have any overdraft activity going forward.   This means specifically that funds need to be in the operating accounts at the time items are presented and not covered after the fact the following day.   To be clear – an overdraft item is one in which there are uncollected/insufficient funds in the account to cover said item at the time it is presented.

(Franceschini Decl. Ex. I (email from Micheletti dated June 10, 2014 12:27 PM), ECF No. 347-9.)  Freidman's employee responded: "Please know that we are going to implement a system in which we are going to have daily positive balances on each of the accounts." (Franceschini Decl. Ex. I (email from Elizabeth Otero dated June 10, 2014 7:26 PM), ECF No. 347-9.)

However, it is evident that did not occur.   According to a declaration of Joseph Frattasi, the Commercial Deposit Systems Manager for Citibank, accounts owned by Freidman controlled entities had a total of 3,150 items that were returned during the period of May 15, 2014 through December 16, 2014 as follows: 2610 were returned for insufficient funds, 158 due to uncollected funds, 171 due to stop payment orders, 191 because accounts were blocked because they were

overdrawn for five consecutive days, 10 for irregular or counterfeit signatures, 7 because

accounts had been closed, and 3 because the items were referred to maker.   (Frattasi Decl. ¶ 7,

n.4, Ex. D, ECF Nos. 271, 271-7, 271-8).

When viewed in the context of the complex financial arrangement, and the evidence of

the continual and significant overdraft activity of the Account Holders, a few instances of

erroneously bounced checks do not raise a genuine issue of material fact with respect to

Citibank's good faith or the causation of the Borrowers' defaults under the Loans. To the

contrary, it appears that Citibank provided numerous funding deadline extensions and

accommodations throughout the banking relationship. (See, e.g., Walsh Reply Decl. Ex. E (email

from Franceschini dated May 6, 2013 7:42 AM, email from Franceschini dated June 19, 2013

7:56 AM), ECF No. 90-7; Franceschini Decl. Ex. G (email from Franceschini dated Jan. 2, 2014

8:13 AM, email from Franceschini dated Jan. 13, 2014 12:27:46), ECF No. 347-7; Berman Decl.

Ex. F (email from Franceschini dated Oct. 8, 2014 10:34 AM), ECF No. 343-7.)

Freidman argues that a genuine issue of material fact exists whether checks were

dishonored when sufficient funds had been deposited prior to the noon extended funding

deadline on the date following presentment.   He argues that, in order for Freidman to determine

whether checks were properly bounced, Citibank must produce copies of every check that was

issued and returned. (Mem. of Law in Opp'n at 14, ECF No. 343.)   However, this is not correct.

Review of the debts and credits on the account statement shows whether the account was

sufficiently funded on the date of presentment, as the relevant contractual provisions required,

and if it was not fully funded, shows the amount of the deficit.   (Berman Decl. Ex. K,

Franceschini Dep. at 222-223, ECF No. 343-13.) Citibank provided Freidman with all account

statements, and also provided copies of all deposits made on days when checks were dishonored

for uncollected funds.    (Frattasi Decl. Ex. F, ECF No. 271-10, 271-11, 271-12.)    If Freidman

contends that these checks were wrongfully dishonored because sufficient deposits were made to

cover them, it would be possible to substantiate this by examining the deposits produced by

Citibank and identifying any which should have been made immediately available to draw

against.    Review of copies of all bounced checks would not assist in this analysis.[10]

Freidman further argues that, without copies of the checks, it is impossible to determine

the details of the bounced checks, such as the identity of the payee, and points to the deposition

testimony of Ms. Franceschini where she acknowledged that she could not identify the payees of

checks presented from reviewing an account statement. (Mem. of Law in Opp'n at 10-11, ECF

No. 343.)    However, the name of the payee is irrelevant to a determination whether checks were

improperly bounced.    Rather, as discussed above, the relevant inquiry is whether the accounts

were sufficiently funded.

Therefore, the argument that Freidman requires copies of every check bounced

throughout the parties' banking relationship does not provide any basis to deny or to further

defer consideration of Citibank's summary judgment motion.    See Fed. R. Bank. P. 7056(d).

C.    Notices of Insufficient Funds

Freidman argues that Citibank prematurely issued notices pursuant to the Electronic

Advance Return Notification System ("EARNS") prior to the expiration of the noon funding

deadline, causing "catastrophic damages to Mr. Freidman's businesses." (Mem. of Law in Opp'n

at 9-10, ECF No. 343.)    In support of this argument, Freidman points to the deposition

testimony of Franceschini that Citibank notified parties presenting checks drawn on the accounts

---

[10] It appears that the exchange which took place in Ms. Franceschini's deposition, quoted at page 14 of Freidman's December 16, 2016 Memorandum of Law (ECF Doc. No. 343), relates to an instance where, as discussed in Micheletti's September 30, 2014 email (ECF 343-4) (quoted above), the Account Holders were given an extension to cover an overdraft, but deposited only part of the amount needed to cover the deficit.

that there may be insufficient funds to honor the checks, even though the accounts may have been funded by noon the following day.   (Mem. of Law in Opp'n at 9, ECF No. 343.)

Subsequent to Ms. Franceschini's deposition, Citibank provided a detailed explanation of the operation of EARNS by Joseph Frattasi, the Commercial Deposit Systems Manager for Citibank. (Frattasi Decl. ¶ 1, ECF No. 271.)   Frattasi explained that EARNS notices were generated as follows.   At approximately 10:00 p.m. each business day, Citibank's automated systems reviewed all of that day's transactions.   (Frattasi Decl. ¶2, ECF No. 271.)   This included reviewing images of checks presented to other banks that were drawn against Citibank accounts. (Frattasi Decl. ¶ 2, ECF No. 271.)   Each transaction was then posted as a debit or a credit to that particular account.   (Frattasi Decl. ¶ 2, ECF No. 271.)   At that time, Citibank's system automatically generated a list of checks drawn against accounts with insufficient available funds or for which further review was required, for example, when a timely order to stop payment was received (the "Exceptions List.").   (Frattasi Decl. ¶ 2, ECF No. 271.)   The Exceptions List and a list of stop payment orders was delivered to the Online Overdraft ("OLOD") system, "with automatic electronic decisioning of the disposition of items (e.g., pay/return items; charge/waive fees)."   (Frattasi Decl. ¶ 2, ECF No. 271.)

The following morning, Citibank's relationships managers reviewed the Exceptions List and decided whether to override a return designation and cause the debit to be honored. (Frattasi Decl. ¶ 3, ECF No. 271.)   If a relationships manager did not override the system's automated decision to return a check by the afternoon on that day, the check was returned. (Frattasi Decl. ¶ 3, ECF No. 271.)   Additionally, at the expiration of the afternoon override deadline, Citibank would issue an EARNS notice to the bank of first deposit for each returned check over $2,500, in accordance with federal banking regulations, notifying the bank of first

deposit that insufficient funds were available to cover the check.   (Frattasi Decl. ¶ 4, ECF No. 271.)   Use of EARNS is not unique to Citibank; when Citibank is presented with a check drawn on another bank's account for which insufficient funds are on deposit, that bank will send Citibank an EARNS notice.   (Frattasi Decl. ¶ 5, ECF No. 271.)

Freidman's argument that Citibank improperly issued EARNS notices prior to the noon funding deadline fails for several reasons. First, every relevant agreement required the Account Holders to have a sufficient account balance by the end of business on the day the debits were presented.   Although it is undisputed that Citibank had the ability to override the computer system's issuance of these notices, nothing in the contract obligated Citibank to do so.   Second, the record shows that an EARNS notice was only issued in the afternoon of the day following presentment if no manager authorized an exception to the overdraft.   (Frattasi Decl. ¶¶ 3- 4, ECF No. 271.)   Put differently, at the time an EARNS notice was issued, either no exception to overdraft was granted or the extended funding deadline already expired.   Indeed, at a hearing on September 14, 2016, Freidman's counsel conceded that no EARNS notice would have been issued prior to the expiration of any extended funding deadline, after a final decision had been made <u>not</u> to pay the items in question. (Tr. 9/14/16 at 9-10, ECF No. 289.)[11]   If EARNS notices, stating that insufficient funds were available, we issued for checks which were being dishonored, such notices were correct.

---

[11]  The following exchange occurred at the hearing on September 14, 2016:
>     THE COURT:   . . .[M]y question to Ms. Van Roy is when did the EARNS notices go out. Do they go out at the end of day one, or do they go out on day two after the decision to pay or not pay has been made? So they would only then go out as to checks which where a decision, final decision has been made not to pay.
>     MS. VAN ROY: Correct, Judge.
>     THE COURT: Okay. Do you have a disagreement with that?
>     MR. BERMAN: No.
(Tr. 9/14/16 at 9:21-10:5, ECF No. 289)

In addition, Freidman has not provided evidence of any damages caused by the issuance of the EARNS notices, or how these notices caused a default under the Loans.   There is no evidence of the amount, if any, of drivers or vendors lost as a result of the EARNS notices, no evidence of any damaged credit rating or the inability to refinance, or any other form of damages, all of which information would be within Freidman's custody and control.

For these reasons, Freidman's argument that the issuance of EARNS notices was improper does not raise a genuine issue of material fact with respect to Citibank's good faith or the cause of the Borrowers' defaults under the Loans.

D.  Holds on Accounts

Freidman argues that Citibank inexplicably placed holds on the Borrowers' accounts, completely blocking the Borrowers' ability to fund the accounts, causing bounced checks even when the Borrowers attempted to wire sufficient funds. (Dumitru Aff. ¶¶ 14, 15, 16, 17, ECF No. 343-3.)   Freidman also contends that Citibank would take weeks before refunding the Account Holders with the funds from wires that were cancelled by the Account Holders.   The only evidence cited in support of this claim is an email conversation dated November 17, 2014, in which Micheletti informs Dumitru that additional information is required before certain wires to payees totaling $18,394.65 can be completed, such as the payees' full names and dates of birth. (Dumitru Aff. Ex A, ECF No. 343-3.).   In response, on November 19, 2014, Friedman directs that the wires be cancelled, but it appears that they had not been cancelled by November 21, 2014.   (Dumitru Aff. Ex A, ECF No. 343-3.)   Freidman does not explain how to failure to immediately cancel these wire transfers adversely impacted the Account Holders such that it would cause a default under the Loans.

It should be noted that, although Friedman argues that holds were placed on the accounts to make things easier for Citibank (Mem. of Law in Opp'n at 5, ECF No. 343), the single email exchange cited by Friedman in support of this argument actually reflects the opposite - that Citibank modified the account to make it easier for the Account Holders to transfer funds into the account.   (Compare Berman Decl. Ex. D, ECF No. 343-5, with Franceschini Aff. Ex. F, ECF No. 347-6.)

E.   Fraudulent Inducement

Freidman argues that Citibank is precluded from recovering on the guaranties because Citibank fraudulently represented that the Account Holders would have until noon on the day following presentment to fund the accounts. It is unclear whether Freidman asserts that the fraudulent statements were made prior to, or after, the commencement of the banking relationship.   Either way, this argument fails.

Under New York law, the party asserting a claim for fraud in the inducement "must establish a representation of material fact which is untrue and known to be untrue or recklessly made, and one which is 'offered to deceive the other party and to induce them to act upon it, causing injury.'" Tucker Leasing Capital Corp. v. Marin Med. Mgmt., 833 F. Supp. 948, 958 (E.D.N.Y. 1993) (quoting Jo Ann Homes at Bellmore v. Dworetz, 25 N.Y. 112, 119 (1969) and citing cases).   However, a fraudulent inducement claim is subject to waiver by an unconditional and irrevocable guaranty.   Tucker Leasing, 833 F. Supp. at 958; Citibank, N.A. v. Plapinger, 66 N.Y. 2d 90 (1985).

The guaranties in this case specifically "waive[] all suretyship defenses, any rights to interpose any defense, counterclaim or offset of any nature and description which [Freidman] may have or which may exist between and among Lender, Borrower and/or [Freidman] with

respect to [Freidman's] obligations under this Guaranty, or which the Borrower may assert on the underlying debt, including but not limited to failure of consideration, breach of warranty, fraud, payment (other than cash payment in full of the Obligations), statute of frauds, bankruptcy, infancy, statute of limitations, accord and satisfaction, and usury."   (Guaranty ¶ 3, Walsh Aff., Exs. E, J, N, ECF Nos. 92-14, 92-15, 92-27, 92-28, 92-29, and 92-33.)

Even if not waived, Freidman did not provide any evidentiary support for his fraudulent inducement defense.   Freidman has not provided any evidence of any representation made by Citibank that, even though the contract requires funding to be provided on the day of presentment, the funding deadline would actually be noon on the following day.   Additionally, the Master Cash Management Service Agreement expressly provides: "This Agreement constitutes the final and complete agreement between Bank and Client with respect to the Services and any required Software, and supersedes all other oral or written agreements, understandings and representations." (Master Cash Management Service Agreement ¶ 15(i), ECF Nos. 90-5; 343-11.)

None of the evidence presented suggests that Citibank made such a representation.   One would expect Freidman or his employees to have made that assertion in response to the numerous emails reminding the Account Holders of the requirement to fund the accounts on the date of presentment.   Instead, Freidman's employees acknowledged the overdraft activity, and requested additional time to fund the accounts.   (Berman Decl. Ex. F (email from Elena Nicolescu dated Oct. 8, 2014 10:24 AM), ECF No. 343-7; Franceschini Decl. Ex. G (email from James Johnson dated Jan. 2, 2014 12:44 PM; email from Everett Abitbol dated Jan. 13, 2014 10:55 AM; email from James Johnson dated May 14, 2014 4:38 PM), ECF No. 347-7.)

The guaranties were the "product of negotiations between sophisticated business people who knowingly bargained for an unconditional obligation." <u>Tucker Leasing</u>, 833 F. Supp. at 959 (quoting <u>Generale Bank v. Wassel</u>, 779 F. Supp. 310, 317 (S.D.N.Y. 1991). Because the fraudulent inducement defense contradicts the waiver in the guaranties, "even if there are disputed issues of fact on these matters, the controlling law dictates that these issues are not material, and do not preclude a grant of summary judgment." <u>Generale Bank</u>, 779 F. Supp. at 320. For these reasons, Freidman's argument of fraudulent inducement must be rejected and does not preclude summary judgment on his liability under the guaranties.

F. <u>Counterclaims</u>

Citibank also seeks summary judgment dismissing the counterclaims asserted by Freidman. Because all of the counterclaims either lack substantiation or are waived pursuant to Freidman's guaranties, the counterclaims should be dismissed.

Freidman asserted the following counterclaims: (1) fraudulent inducement; (2) fraud; (3) negligence; (4) tortious interference; (5) negligent misrepresentation; (6) breach of fiduciary duty; (7) unjust enrichment; (8) breach of contract; (9) recoupment; (10) breach of covenant of good faith and faith dealing; (11) declaratory judgment that Citibank could not accelerate the $21 Million Loan on the alleged failure to pay the $10 Million Loan; and (12) accounting. (Verified Answer and Countercl. at 40-47, ECF No. 54-9.)

All counterclaims based upon the allegations that Citibank acted in bad faith by terminating the zero balance account arrangement in May 2014, or by terminating the banking relationship with the Account Holders in December 2014, or by mismanaging the Account Holders' bank accounts, should be dismissed for the reasons discussed above, as should the counterclaim based upon fraud in the inducement. To the extent a claim of breach of fiduciary

duty is not waived by Freidman's guaranties, it should be dismissed because Freidman has not pointed to any evidence that a fiduciary relationship existed between him and Citibank. Summary judgment should also be granted with respect to the remaining counterclaims because they are waived by the guaranties.   <u>Street</u>, 421 F. App'x at 73 ("[U]nconditional guaranties have been held to foreclose, as a matter of law, guarantors from asserting any defenses or counterclaims." (citing <u>First N.Y. Bank for Business v. DeMarco</u>, 130 B.R 650, 654 (S.D.N.Y. 1991))).

<u>CONCLUSION</u>

Review of the evidence presented on this motion results in the conclusion that Freidman has not raised a genuine issue of material fact with respect to Citibank's entitlement to summary judgment on his guaranties of the Loans, or dismissal of the counterclaims asserted by Freidman. Therefore, Citibank's motion should be granted.



**Dated: Brooklyn, New York**
**March 30, 2017**

_____
**Carla E. Craig**
**United States Bankruptcy Judge**